UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT ORTIZ, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 24-cv-11704-ADB |
| LELAND DUDEK,[1] | * | |
| Acting Commissioner of the Social Security Administration, | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

      Plaintiff Robert Ortiz ("Plaintiff") brings this action pursuant to § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Title XVI Supplemental Security Income ("SSI"). Currently pending are Plaintiff's motion to reverse the administrative law judge's ("ALJ") November 29, 2023 decision, [ECF No. 10], and the Commissioner's cross-motion to affirm the ALJ's decision denying SSI benefits, [ECF No. 15]. For the reasons set forth below, Plaintiff's motion is **GRANTED**, and the Commissioner's motion to affirm is **DENIED**.

---

[1] Leland Dudek is substituted as defendant in this case in his official capacity as Acting Commissioner of the Social Security Administration. *See* Fed. R. Civ. P. 25(d).

# I.     BACKGROUND

## A.     Statutory and Regulatory Framework:  Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled."  *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (or the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death[,] or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. § 423(d)(1)(A).  The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy.  *See* 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process.  The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional

2

capacity" [RFC] is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

Plaintiff has the burden of proof through step four of the analysis, including the burden to demonstrate RFC.  *See Flaherty v. Astrue*, No. 11-cv-11156, 2013 WL 4784419, at *8–9 (D. Mass. Sept. 5, 2013).  At step five, the Acting Commissioner has the burden of showing the existence of jobs in the national economy that Plaintiff can perform notwithstanding his restrictions and limitations.  *Goodermote v. Sec'y of Health & Hum. Servs.*, 690 F.2d 5, 7 (1st Cir. 1982).

### B.    Factual Background

Plaintiff was thirty-two at the time of his April 2020 onset date.  Tr. 295.  He has a GED and has completed some college courses.  *Id.* at 615.  Plaintiff previously worked as a housekeeper and a construction worker prior to being stabbed in his left bicep and elbow region on April 18, 2020.  *Id.* at 19, 22, 107, 37.

### C.    Procedural History

On April 29, 2020, Plaintiff applied for SSI benefits, asserting an April 18, 2020 onset date.[2]  Tr. 295–304.[3]  The Social Security Administration ("SSA") denied Plaintiff's application initially on September 8, 2020, and on reconsideration on October 22, 2020.  *Id.* at 88–92, 95–

---

[2] The relevant period in this case is April 29, 2020, the date Plaintiff filed his SSI claim, through the date of the ALJ's November 29, 2023 decision.

[3] References to pages in the Administrative Record, which was filed electronically at ECF No. 9, are cited as "Tr. ___."

100.  Plaintiff subsequently requested a hearing, which ALJ Jonathan Baird held in September 2022.  *Id.* at 61-87.

In his decision,[4] the ALJ found Plaintiff disabled.  Tr. 104–08.  Applying the five-step sequential evaluation process for determining whether an individual is disabled, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity as of his April 2020 onset date, through the date of the ALJ's November 2022 decision.  *Id.* at 104.

At step two, the ALJ determined that Plaintiff suffered from the following severe impairments:  left median nerve neuropathy, ulnar neuropathy, and status post injury left arm. Tr. 104.  The ALJ, however, found that Plaintiff's depressive disorder and anxiety disorder were "non-severe" because Plaintiff possessed either no limitations or mild limitations in all four Paragraph B categories.  *Id.* at 104–05.

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment.  Tr. 105.  The ALJ did not specifically consider any listings.  *Id.*

At step four, the ALJ found that Plaintiff possessed an RFC for light work "except [that] he can perform no more than occasional reaching, handling, and fingering with his non-dominant left upper extremity."  Tr. 105.

Subsequently, at step five, the ALJ found that Plaintiff was unable to perform any of his past, relevant work.  Tr. 107.  Relying on the testimony of a vocational expert ("VE"), the ALJ found that there were no jobs in the national economy that a person with Plaintiff's RFC could perform, and thus found Plaintiff disabled at step five.  *Id.* at 107–08.

---

[4] The November 2022 decision was the ALJ's first decision that preceded the November 2023 decision on appeal before the Court.

Subsequently, on December 21, 2022, on its own motion, the Appeals Council granted review, vacated the ALJ's decision finding disability, and remanded to the ALJ for further proceedings.  Tr. 113–17.  The Appeals Council found that the record lacked substantial evidence to support the ALJ's "decisional findings" and that the ALJ erred as a matter of law in relying on vocational evidence that was inconsistent with SSA rules.  *Id.* at 113–15.

Regarding the lack of substantial evidence, the Appeals Council made two findings. First, it found that the record failed to support the ALJ's findings, stating that "there [was] no medical evidence of treatment for any impairments, including those found severe in the decision, from September 23, 2020, through March 15, 2022."[5]  Tr. 114.  Second, the Appeals Council noted March and September 2022 records from Plaintiff's neurologist, Dr. Hassan Bashir ("Dr. Bashir"), and found that Dr. Bashir's visit records did "not show significant limitations in the use of [Plaintiff's] left arm and hand for grasping, handling[,] and fingering."  Tr. 114; *see also id.* at 488–92, 579-88.  As such, the Appeals Council disagreed with the ALJ's RFC assessment that, based on "the available evidence," Plaintiff was "limited to only occasionally reaching, handling[,] and fingering with his left arm and hand."  *Id.* at 115.

As for the legal error, the Appeals Council found that the VE's testimony that "a limitation to occasional reaching, handling, and fingering would preclude all work at the light, unskilled occupational base" was contrary to Social Security Ruling[6] ("SSR") 83–12 and the

_____

[5] For the reasons described below, this finding was erroneous.

[6] SSRs are binding on all Social Security Administration personnel, including state agency adjudicators, administrative law judges, and the Appeals Council.  *See McDonald v. Sec'y of Health & Hum. Servs.*, 795 F.2d 1118, 1125 (1st Cir. 1986).

Dictionary of Occupational Titles ("DOT").[7] Tr. 115. The Appeals Council held that, given that Plaintiff "has no manipulative limitations in his right upper extremity and retains some use of the left arm and hand," his "occupational base would be greater" than that testified to by the VE. *Id.*

On remand, the Appeals Council ordered the ALJ to reassess Plaintiff's RFC, reevaluate the medical opinions, reconsider Plaintiff's past relevant work, and "[i]f warranted by the expanded record, obtain supplemental evidence from a [VE] to clarify the effect of the reassessed [RFC] limitations on [Plaintiff's] occupational base." Tr. 115–16.

Additionally, the Appeals Council ordered the ALJ to "[o]btain additional evidence concerning [Plaintiff's] impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence." Tr. 115. It noted that "[t]he additional evidence may include, if warranted and available, a consultative examination and medical source opinions about what the claimant can still do despite his impairments." *Id.* The Appeals Council further stated that "[i]f necessary and available, [the ALJ should] obtain evidence from a medical expert ["ME"] related to the nature, severity, duration, and/or limiting effects of [Plaintiff's] impairments." *Id.* at 116.

---

[7] The DOT is a "Department of Labor publication that identifies thousands of jobs by name and describes the skills and capacity for physical exertion required to perform each." *Purdy v. Berryhill*, 887 F.3d 7, 14–15 (1st Cir. 2018).

SSR 83-12 provides guidance for ALJs when an "individual's residual functional capacity (RFC) does not coincide with any one of the defined exertional ranges of work," and requires the ALJ in such circumstances to use a VE to determine the impact of the RFC limitations on the claimant's occupational base. SSR 83–12 (PPS–103), *Titles II and XVI: Capability to Do Other Work—The Medical–Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work*, 1983 WL 31253 (Jan. 1, 1983).

The same ALJ, ALJ Baird, was assigned to the case on remand, and he held a second hearing on June 15, 2023.  Tr. 30–60.  At that hearing, Plaintiff testified regarding his mental health impairments, explaining that his therapist left the practice and that he was never provided with a new therapist.  *Id.* at 45.  Plaintiff then added, "that's why it's so lonely because there's no one there that's going to understand and there's no one there who's really going to listen and to understand what's going on."  *Id.*  In response, the ALJ stated that he would order a consultative examination with a psychiatrist or psychologist to "address . . . the psychological issues" Plaintiff "talked about" at the hearing.  *Id.* at 45–46.  The ALJ explained that he thought it was "a good idea" because SSA does not "really have . . . current records on that part of the case."  *Id.* at 46.

In July 2023, psychologist, Dr. Renee Hoekstra ("Dr. Hoekstra"), completed an opinion regarding Plaintiff's mental impairments, as described in more detail below.  Tr. 613–17.  That opinion, however, did not opine regarding the functional limitations associated with Plaintiff's mental impairments.  *Id.*

The ALJ did not obtain any consultative opinions or ME testimony regarding Plaintiff's physical impairments on remand.  As a result, in terms of medical opinions, the ALJ relied solely on the two existing 2020 opinions from state agency physicians, described in more detail below – neither of which addressed the functional limitations associated with Plaintiff's physical impairments because, at the time they were completed, both physicians mistakenly believed Plaintiff's physical impairment symptoms would not last for one year.  Tr. 21–22, 91, 98–100.

Accordingly, on remand, the ALJ made his decision absent *any* medical opinions regarding Plaintiff's functional limitations – physical or mental.

On November 29, 2023, in his second written decision, the ALJ found Plaintiff not disabled at step five of the sequential analysis. Tr. 11–29. The Appeals Council denied Plaintiff's request for review of the ALJ's decision on May 1, 2024. *Id.* at 1–6. Having exhausted his administrative remedies, Plaintiff filed the instant Complaint with this Court on July 1, 2024, seeking review of the Commissioner's final decision pursuant to section 405(g). [ECF No. 1].

**D.      Relevant Medical Evidence and Opinions**

**1.      Pain and Physical Impairments**

After Plaintiff was stabbed in the left arm on April 18, 2020, he had surgery and was subsequently diagnosed with left median neuropathy, left ulnar neuropathy, left radial neuropathy, and "[l]eft medial antebrachial cutaneous nerve laceration." Tr. 442, 448–49. During surgery, Plaintiff's surgeon, Dr. Charles Cassidy ("Dr. Cassidy"), performed ulnar and median neuroplasty and a vein graft. *Id.* at 449–50.

At his April 29, 2020 follow-up appointment with another treating orthopedic surgeon, Dr. Jennifer Hoffman ("Dr. Hoffman"), Plaintiff noted that his pain had improved. Tr. 453. Dr. Hoffman's examination, however, revealed that Plaintiff had "diminished sensation to light touch in the left medial forearm," and a "mildly stiff digital range of motion" such that he was unable "to make a full composite flexion fist." *Id.*

In May 2020, Plaintiff reported to Dr. Hoffman that he was "doing well" and that his pain had generally improved from his prior visit, but that it was "worse with [the] extension of [his] elbow." Tr. 548. He also noted "waxing and waning numbness and tingling in his palm, medial forearm[,] and around his incision site." *Id.* at 548–49. In early June 2020, upon examination, Dr. Hoffman observed that Plaintiff's "[s]ensation" was "mildly altered to light touch throughout

8

all of [his] median and ulnar distributions of hand and forearm, but improved from last visit." *Id.*

at 550. Dr. Hoffman diagnosed "left median nerve neuropathy," "ulnar neuropathy of left upper

extremity," and "nerve laceration." *Id.* at 551. She advised that Plaintiff could "start WBAT

[weight bearing as tolerated] without restriction," but recommended that "he continue to work on

elbow/wrist/digital" range of motion. *Id.* Dr. Hoffman further advised Plaintiff that "nerve

recovery is slow," but that "his sensation will continue to improve with time." *Id.*

Subsequently, later in June 2020, Dr. Hoffman noted that Plaintiff reported his range of

motion had improved, but that he continued to experience numbness "especially when holding

objects." Tr. 544–45. Upon examination, Dr. Hoffman again observed that Plaintiff's

"[s]ensation" was "mildly altered to light touch throughout all of [his] median and ulnar

distributions of hand and forearm, but improved from last visit." *Id.* at 546. Dr. Hoffman stated

that Plaintiff was "progressing nicely" and that "the nerves take a while to full[y] recover," but

that she "expect[s] him to continue to improve." *Id.* at 547. She advised Plaintiff to "continue to

work on" range of motion. *Id.*

Thereafter, on August 12, 2020, Dr. Hoffman noted that Plaintiff continued to have "dull

aching" elbow pain with "perhaps a greater frequency," "[c]ontinued numbness," and

"discomfort with grip." Tr. 464. Dr. Hoffman referred Plaintiff to occupational therapy ("OT")

for work on his range of motion, "strengthening, and desensitization of [his] left elbow." *Id.* at

466. Dr. Hoffman additionally diagnosed Plaintiff with PTSD and depression, and referred

Plaintiff to therapy because he "expressed some difficulty dealing with the psychological and

emotional aspects of his recovery." *Id.* at 466, 464.

In August 2020, Plaintiff attended two OT sessions with Northeast Rehabilitation

occupational therapist, Laurie Hayes ("Therapist Hayes"), during which Plaintiff advised

Therapist Hayes that he was experiencing "shooting pain all the time both when not using and [when] using [his] l[eft] arm," that his "arm doesn't do what I want all the time," and that he was waking up at night "due to arm spasms." Tr. 603. Plaintiff further said that he was required to use his right hand for most of his activities of daily living ("ADLs")—including dressing, combing his hair, driving, and caring for his children— because of pain and difficulty with "gripping and holding." *Id.* at 603–04 (noting that, among other things, Plaintiff was having "difficulty caring for [his] [two] year-old due to needing to carry and lift child"). Therapist Hayes noted that Plaintiff's daily anxiety and mood changes were a complicating factor in the treatment of his physical impairments. *Id*. at 603.

Upon examination, Therapist Hayes observed that Plaintiff suffered from a reduced range of motion in his wrist, forearm, and elbow, along with "sensitivity to scar, weak grip, pinch[,] and elbow strength." Tr. 604. She further observed that Plaintiff was experiencing "pain, tingling[,] . . . decreased ability to use [his] hand," and "spasms and weakness" during his ADLs. *Id.* She diagnosed "weakness, pain, hypersensitivity" and "decreased ability to participate in ADL[s]," for which she prescribed "skilled therapy to restore [Plaintiff's] prior level of function." *Id.* at 606.

Following his initial August 17, 2020 evaluation, Plaintiff attended only one follow-up OT visit several days later. Tr. 591–98. During that session, Plaintiff's pain level was observed to be an "8/10," and he fatigued quickly and experienced cramping. *Id.* at 599. Therapist Hayes noted that Plaintiff would "continue[] to benefit from skilled OT to maximize his abilities and improve his function." *Id.* Northeast Rehabilitation, however, advised Plaintiff that he would need a referral letter from a primary care physician ("PCP") to continue, to which Plaintiff

responded that he did not have a PCP.[8]  *Id.* at 598.  Northeast Rehabilitation then discontinued Plaintiff from OT.  *Id.*

On August 25, 2020, non-examining state agency physician, Dr. Henry Astarjian ("Dr. Astarjian"), reviewed Plaintiff's medical records and opined on initial review that Plaintiff's stab wound injury did not constitute a severe impairment because it would "not last [twelve] months." Tr. 91.  Given this belief, Dr. Astarjian did not assess the functional limitations associated with Plaintiff's physical impairment.  *Id.*

Approximately two weeks later, on September 3, 2020, Plaintiff established care with PCP, Dr. Durathun Farha ("Dr. Farha"), in Lawrence, Massachusetts, with SMG Pleasant Valley Internists ("SMG").  Tr. 571–73.  Dr. Farha diagnosed weakness of the left arm and chronic pain, along with depression.  *Id.* at 573.  Dr. Farha prescribed nortriptyline and Wellbutrin and referred Plaintiff to a psychiatrist and for physical therapy.  *Id.*

On September 23, 2020, Plaintiff reported improvement in pain and numbing to physician's assistant ("PA") Neboh Ikenna (from Dr. Hoffman's office) ("PA Ikenna").  Tr.  474. PA Ikenna noted that Plaintiff had "achieved full ROM of the left elbow," but that he needed to continue his home exercises to improve his strength and sensation.  *Id.* at 475.  Plaintiff reported to PA McKenna that his OT had been discontinued for lack of a referral, and McKenna wrote Plaintiff a new prescription for OT and advised that the OT therapist could call Dr. Hoffman's office "if they needed additional paperwork."  *Id.*  PA McKenna further noted that Plaintiff was having difficulty getting a mental health appointment, and that she advised Plaintiff to continue to "call around."  *Id.*

---

[8] It is unclear from the record why Plaintiff's orthopedic surgeon, Dr. Hoffman's referral was not sufficient.  *See* Tr. 594 (referral from Dr. Hoffman's office).

On September 30, 2020, Plaintiff began mental health treatment with Northeast Family Services/ Northeast Behavioral Associates, as discussed in more detail below.  Tr. 493–543.

In October 2020, on reconsideration, non-examining state agency physician, Dr. Birendra Sinha, like Dr. Astarjian, opined that Plaintiff's stabbing injury would not be severe for a duration of twelve months, and thus did not address Plaintiff's related functional limitations.  Tr. 98–99.

As for Plaintiff's mental impairments, non-examining state agency psychologist, Dr. Joanne Hardenbrook, opined in October 2020 that Plaintiff did not suffer from any psychological impairments, noting that he was not receiving psychiatric treatment, had no history of psychiatric treatment, was not on psychiatric medications, and there were "no ADLs to further elaborate on possible psych issues."[9]  Tr. 97.  Accordingly, Dr. Hardenbrook did not consider the impact of Plaintiff's mental health symptoms on his functioning.  *Id.*

In December 2020, Plaintiff reported to PCP, Dr. Farha, that he was still experiencing pain when using his arm.  Tr. 568.

In September 2021, Plaintiff continued to report "[p]ersistent left elbow pain" to Dr. Farha.  Tr. 562.  Dr. Farha made "normal" musculoskeletal, neurologic, and psychiatric routine findings.  *Id.* at 563.  She also increased Plaintiff's Wellbutrin dosage.  *Id.* at 564.

In December 2021, NP Danielle LeMay from Dr. Farha's office noted that Plaintiff continued to suffer from left "arm pain, neuropathy, [and] weakness," for which physical therapy "was not helpful."  Tr. 557–58.  Plaintiff reported that, at times, he was unable to open or close his left hand and that he was experiencing "'shock like' pain up and down his arm."  *Id.* at 558–

---

[9] Dr. Hardenbrook appears to have been unaware of Plaintiff's concurrent mental health treatment at the time of her opinion.  *See* Tr. 96–97 (noting evidence of record considered).

59.  He stated that he compensated for his left hand by overusing his right arm, and that, as a result, he was experiencing pain in both arms.  *Id.* at 558.  NP LeMay's examination revealed "abnormal strength" and "weakness" in Plaintiff's left arm, along with "tenderness" for which she ordered "nerve conduction" or EMG testing, referred Plaintiff to neurology, and prescribed Gabapentin. *Id.* at 559.

On March 15, 2022, Plaintiff saw neurologist, Dr. Bashir, who noted that Plaintiff reported suffering from "ongoing issues" related to the stab injury, including pain and recurrent "bolt[s] of electricity shooting down [his] arm into digits 2-4."  Tr. 490.  Plaintiff also complained that his hand refused to "do what I tell it to do," and would sometimes just go "limp," "freeze," or "die[]".  *Id.*  Dr. Bashir noted that Gabapentin helped Plaintiff, but that "for unclear reasons," Plaintiff was only taking it twice a day as opposed to three times a day.  *Id.*  Upon examination, Dr. Bashir observed that Plaintiff experienced "reduced light touch and pinprick [sensation] over [left] medial forearm," and left thumb.  *Id.* at 491.  He diagnosed "numbness and tingling in left hand," "neuropathic pain of left forearm," and "nerve injury."  *Id.*  Dr. Bashir referred Plaintiff for an EMG and work-up.  *Id.*

In or around May 2022, Plaintiff appears to have switched PCP providers from Dr. Farha to Dr. Andrew Lim, also with SMG, but in Methuen, Massachusetts.[10]  Tr. 553–54.  In a May 2022 follow-up with NP LeMay, NP LeMay noted Plaintiff's diagnoses of neuropathy, pain, and paresthesias, and further that Plaintiff was unable to work "as he is in construction."  *Id.* at 554.

Subsequently, in September 2022, Dr. Bashir noted that Plaintiff's EMG appointment had been canceled "for unclear reasons," and, therefore, that the previously recommended EMG had

---

[10] NP LeMay appears to have moved offices as well because she continued to treat Plaintiff following May 2022.  *See* Tr. 554.

not been completed.  Tr. 579–80.  Dr. Bashir further documented that Plaintiff continued to suffer from the same physical symptoms as those reported in March 2022, and that he had not increased his Gabapentin dose as recommended.  *Id.*  Upon examination, Dr. Bashir found that Plaintiff was "stable with very subtle weakness of the left hand and some numbness . . . in an ulnar plus branch median nerve distribution."  Dr. Bashir again prescribed an increase dose of Gabapentin and ordered an EMG.  *Id.* at 580.

On September 29, 2022, Plaintiff had an EMG, which produced normal findings "without electrodiagnostic evidence of cervical radiculopathy, entrapment neuropathy[,] or peripheral neuropathy."  Tr. 583.

In January 2023, Dr. Bashir's visit notes stated that the Gabapentin had "taken away [Plaintiff's] 'lightening bolt pain,'" but that Plaintiff continued to suffer from other pain that was then a "6/10."  Tr. 589.  Dr. Bashir prescribed another Gabapentin increase, and noted that other medications and injections remained an option in the future.  *Id.* at 590.  His prognosis was "that control is conceivably possible with medical therapy but [that Plaintiff's] condition is unlikely to be cured."  *Id.*

In the final record from Dr. Bashir in the court's administrative record, Dr. Bashir noted in July 2023, that Plaintiff's increased Gabapentin dosage was having adverse side effects, including making him very tired and stimulating his appetite.  Tr. 618.  He noted that Plaintiff's pain remained a five or six out of ten, and was "not much different [than] when  he was taking" the lower dose of Gabapentin.  *Id.*  Dr. Bashir reduced Plaintiff's dosage, and noted that Plaintiff "prefer[red] to remain on this [Gabapentin] monotherapy," and that he had "'made his peace with his recovery.'"  *Id.* at 619.  Dr. Bashir advised Plaintiff to contact him if he "wishes [in the future] to try other therapies."  *Id.*

14

### 2. Mental Impairments

On September 30, 2020, approximately five months after the stabbing, Plaintiff began individual therapy with therapist, Shristi Pant, and licensed independent clinical social worker (LICSW), Veronica Boske, with Northeast Behavioral Associates. Tr. 524–36. Plaintiff appears to have participated in therapy from approximately September through December 2020. *Id.* at 506–08 (October 7, 2020 session); *id.* at 497–99 (October 28, 2020 session); *id.* at 494–96, 514–18 (November 4, 2020 session); *id.* at 541–43 (November 11, 2020 session); *id.* at 523 (November 25, 2020 session); *id.* at 538–40 (December 2, 2020 session).

At the outset of treatment, Therapists Boske and Pant assessed depression and anger/aggression, noting that Plaintiff presented as "overwhelmed by multiple stressors," including a "recent injury" and "taking care of his kids," and that he was experiencing "feelings of hopelessness, worthlessness, and irritability daily, which cause[d] him to isolate." Tr. 535-36. At that time, Plaintiff was taking nortriptyline and bupropion (Wellbutrin) as prescribed by Dr. Farha and was living at his fiance's home. *Id.* at 524, 530. Plaintiff advised his therapists that he had "minimal use" of his left arm due to the stabbing, but that he was "still able to use his other arm [to] complete his activities of daily living, though he experiences pain." *Id.* at 525. Plaintiff also reported to his therapists "that he had no development delays," but that he had experienced suicidal ideations in the past. *Id.* at 524, 526.

In his October 2020 sessions, Plaintiff noted that he had been struggling with his negative thoughts as a result of his inability to work. Tr. 507. Plaintiff also described experiencing anger at a recent party, which he was able to manage with his fiance's help. *Id.* at 497–98.

In November 2020, Plaintiff's therapists noted that he reported "feelings of intense anger daily . . . triggered by small stressors," and had "thoughts of hurting others and anger outbursts."

Tr. 516; *see also id.* at 523, 541–42.  Plaintiff received a score of thirty-three on the Clinical

Anger Scale, and promised that he would try a "mood tracking app," diaphragmatic breathing,

and journaling to help control his anger.[11]  *Id.* at 495, 542.

In December 2020, Plaintiff reported that he had recently seen the person who stabbed

him, along with a former co-worker who had previously upset him, which triggered his anger.

Tr. 538.  Plaintiff acknowledged to his therapists that the past traumas made his anger threshold

"low."  *Id.* at 538–39.

On January 6, 2021, Therapists Boske and Pant noted that Plaintiff had missed his prior

two appointments, and stated that Plaintiff "would benefit from figuring out regular session times

for therapy that can work with his busy schedule."  Tr. 512.  They noted that Plaintiff was

diagnosed with major depressive disorder, and that "more information [was] needed to figure out

if [Plaintiff] should receive" a bipolar disorder diagnosis as well.  *Id.*

Following the January 2021 notes, there are no further therapy visit records in the

administrative record.  It appears that Northeast attempted unsuccessfully to recontact Plaintiff

between January 2021 and March 2022.  Tr. 519.

---

[11]  The Clinical Anger Scale ("CAS") is "an objective self-report instrument designed to measure
the syndrome of clinical anger."  William E. Snell et al., *The Clinical Anger Scale: Preliminary
Reliability and Validity*, 51 J. Clinical Psych. 215-26 (1995), Abstract, https://pubmed.ncbi.
nlm.nih.gov/7797645/ (last visited May 12, 2025).  The CAS scale consists of twenty-one
questions with four different options for each statement.  *See What is the Clinical Anger Scale?*,
https://www.carepatron.com/templates/clinical-anger-scale (last visited May 12, 2025) (setting
out Snell's CAS test and scoring).  A CAS score is interpreted as follows: score from 0-13—
"minimal clinical anger;" 14-19— "mild clinical anger;" 20-28 –"moderate clinical anger;" and,
29-63 – "severe clinical anger."  *Id.*

In July 2023, following the Appeals Council remand, psychologist, Dr. Hoekstra, examined Plaintiff and administered a mental state examination ("MSE") in preparing a medical opinion regarding Plaintiff's mental impairments.  Tr. 613–16.

Dr. Hoekstra noted that Plaintiff "bounc[ed] around," living back and forth at his mom's house and at his girlfriend's house.  Tr. 613.  He was taking Gabapentin three times per day "to help with the pain," but it "tend[ed] to make him drowsy and shut him down."  *Id.*  Plaintiff reported that his daily pain level was a "seven" out of ten, and that he was "really aggressive," "very irritable," and "discouraged about the loss of his arm."  *Id.* at 615.  He reported a history of depression and ADHD, and noted that while in school, he was on medication for his ADHD.  *Id.* at 613, 615.

Plaintiff reported that his fiancé and sister kept track of his schedule, and that he relied on them "heavily to manage his life."  Tr. at 613, 615.  He noted that the Gabapentin made him groggy and absent-minded, and that his family had to help him with paperwork.  *Id.*  His fiancé was managing their finances.  *Id.* at 615.

Plaintiff reported that each day, he typically wakes up, takes his medication, showers, and "helps as much as he can" before "collaps[ing]."  Tr. 615.  Plaintiff no longer drives following the stabbing injuries, and he relies on others for rides.  *Id.*  He is able to cook "simple things" that require only one hand.  *Id.*  His fiancé does all the shopping, laundry, and housekeeping, with help from the children.  *Id.*

Plaintiff received a score of 30/30 on the MMSE administered by Dr. Hoekstra, who subsequently diagnosed depressive disorder and "rule out" PTSD and specific learning

disorder/ADHD.[12]  Tr. 615–16.  She did not, however, opine regarding the severity of the

impairments, Plaintiff's RFC, or to any functional limitations associated with Plaintiff's mental

impairments.  *Id.* at 613–16.

### E.    Plaintiff's Testimony[13]

#### 1.    Pain and Physical Impairment Testimony

At his first September 2022 hearing, Plaintiff testified that prior to the stabbing, he was

ambidextrous, but that he is now limited to using his right hand and arm.  Tr. 70.  He stated that

he ended physical therapy because it caused him "more pain."  *Id.*  Plaintiff explained that the

nerve pain – which feels like a "bolt of electricity" – prevents him from using his left hand to

hold even a water bottle.  *Id.*  Plaintiff estimated that with his right arm, he could probably lift

fifty or sixty pounds "as long as it [was] in the shape of something that one hand [could] carry."

*Id.* at 71.

As a result of the injury to his left arm and hand, Plaintiff testified that his right hand gets

overworked.  Tr. at 70.  In September 2022, Plaintiff estimated that his pain was a twenty on a

scale of one to ten, but noted that the pain, while constant, fluctuated between "moderate" and

"excruciating."  *Id.* at 72.  Plaintiff explained that Gabapentin helped the nerve pain, but not the

muscle pain.  *Id.* at 73.  While he described the nerve pain as a "bolt of electricity," he stated the

---

[12] "A 'rule out' diagnosis . . . 'means that there is evidence that [the claimant] [may] meet the
criteria for that diagnosis, but [the medical source] need[s] more information to rule it out.'"
*Madera v. Colvin*, No. 15-cv-30133-MGM, 2016 WL 7331555, at *2 (D. Mass. Dec. 16, 2016)
(citing *Morin v. Colvin*, No. 13-cv-00220, 2014 WL 268721, at *2 n.3 (D.N.H. Jan. 23, 2014)).

[13] The administrative record does not appear to contain any written function reports from
Plaintiff; thus, this section is based exclusively on Plaintiff's hearing testimony.

muscle pain was a "throbbing" or "aching" or a "squeezing like somebody ha[d] a vice around [his] bicep." *Id.* at 78.

Plaintiff also explained that his left hand sometimes went "limp" or refused to move, and that he also suffered from numbness in his lower forearm that his physicians told him was permanent. Tr. 78–79. He stated that the goal was to treat him with medication to control the pain. *Id.*

Plaintiff further testified that the side effects of his Gabapentin prevented him from doing sedentary jobs because the medication puts him to sleep. Tr. 80. He also testified that it would be difficult to perform a job one-handed because his right arm would get tired. *Id.* at 81.

At his second June 2023 hearing, Plaintiff testified similarly to the September 2022 hearing regarding his physical symptoms and pain. Tr. 30–60. He stated that he was unable to hold a cigarette in his left hand. *Id.* at 37. Plaintiff explained that his medical providers continued to increase his Gabapentin dosage in an attempt to control the pain, but that there was still a numbing, dull pain, and the medication "knock[s]" him "out." *Id.* at 40.

In terms of his daily routine, Plaintiff's girlfriend gets his daughter ready for school, and Plaintiff takes her to the bus. Tr. 40, 47. He testified that he typically watches television, falls asleep, and then wakes up to take his next Gabapentin dose – and that the "ongoing cycle. . . just repeats." *Id.* at 40; *see also id.* at 47. Plaintiff again testified that while he used to play video games, he could not play them anymore because he is unable to focus due to the pain and because his hand "just stop[s] working." *Id.* at 48. Plaintiff does not have a driver's license, but, regardless, he is unable to drive safely due to the side effects of Gabapentin. *Id.*

### 2.    Mental Health Testimony

At the first September 26, 2022 hearing, Plaintiff testified that he was "always open to new work, anything [he] can do to support [his] family," but that his "mental state" and the side effects of Gabapentin made it difficult for him to be around other people.  Tr. 74.  He stated that he had a therapist, but that she left the practice, and he had not found anyone else to replace her. *Id.* at 74-75.

Plaintiff additionally testified that he had "contemplated just taking [his] life on numerous occasions" because he didn't "feel like [he was] anything remotely close to who [he was] supposed to be anymore because [he was] so prohibited in what [he] can and cannot do." Tr. 75.  Plaintiff noted that his depression was "dominant," and that when he was not with his four year-old daughter, he was locked in a room staring at a television.  *Id.*

Plaintiff added that his daughter gave him "the strength to wake up in the morning," and to be at the hearing testifying that day, but that he could no longer be her "super dad" because he was just a "shell of the man [he] used to be."  Tr. 81–82.  Plaintiff explained that his fiance's oldest daughter helped him with his younger daughter so much that it was like Plaintiff was "the baby now" with "everybody [] trying to make sure [he] can do things."  *Id.* at 80.

At his second hearing in June 2023, Plaintiff testified similarly, noting that he persistently felt helpless and like a burden to his fiancé and his kids.  Tr. 41.  He noted that it was "dark" feeling "so useless" and like he "physically cannot provide for [his] kids."  *Id.* Plaintiff explained that his fiancé preferred for him to just stay home because he is angry and "snap[s]" when "out in public."  *Id.* at 42.  He testified that he had been trying to go to therapy or counseling since his therapist left the practice, but that the "guy" he spoke to "never set up a meeting."  *Id.* at 45.  He

added that he was lonely because "there's no one there that's going to understand . . . [or] listen."[14]  *Id.*

F.        **ALJ's Decision**

In his second decision on November 29, 2023, ALJ Baird found that Plaintiff was not disabled under the Act.  Tr. 14-23.  Applying the five-step sequential evaluation process for determining whether an individual is disabled, the ALJ made steps two, three, and four findings nearly identical to those he made in his prior decision.  *See id.* at 16–18; *cf. id.* at 104–07.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his April 29, 2020 application date.[15]  Tr. 16

At step two, the ALJ determined that Plaintiff suffered from the following severe impairments:  "status post-stab wound and left arm surgery, left median and ulnar neuropathy." Tr. 17.  Again, the ALJ found that Plaintiff's mental impairments, including his major depressive order and PTSD, were not severe, and that Plaintiff possessed either no limitations or mild limitations in all four Paragraph B categories.  Tr. 17–18.  In support the ALJ noted Dr. Hoekstra's July 2023 examination and opinion, in which Dr. Hoekstra diagnosed Plaintiff with major depressive disorder, PTSD, and "specific learning disorder/ADHD."  *Id.* at 17 (citing *id.* at

---

[14] As noted, at that point, the ALJ stated he would order a consultative examination with a psychologist to "address . . . [Plaintiff's] psychological issues." Tr. 46.

[15] In his second decision, at step one, the ALJ accurately noted the commencement of the relevant period as April 29, 2020, Plaintiff's SSI application date.  Tr. 16.  By contrast, in his first decision, the ALJ utilized Plaintiff's April 18, 2020 onset date.  *Id.* at 104.  Given that the SSI application date commences the SSI relevant period, the ALJ's utilization of the April 29, 2020 application date in his second decision was correct.

616).[16]  In support, the ALJ noted Dr. Hoekstra's findings regarding Plaintiff's mini MSE test results, his limited mental health treatment in 2020, and his Wellbutrin prescription.  *Id.* at 17.

At step three, the ALJ again determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment, and, in doing so, did not specifically consider any listings.  Tr. 18.

At step four, like his past decision, the ALJ found that Plaintiff possessed an RFC for light work "except he can occasionally reach, handle, and finger with the left upper extremity." Tr. 18.

Subsequently, at step five, the ALJ found that Plaintiff was unable to perform any of his past, relevant work but, relying on the testimony of a new VE, determined that Plaintiff could perform the jobs of stock checker, usher/lobby attendant, and school bus monitor, and thus was not disabled.  Tr. 22–23.

## II.    STANDARD OF REVIEW

This Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *accord Sacilowski v. Saul*, 959 F.3d 431, 437 (1st Cir. 2020) (citation omitted) (holding the court reviews "whether the final decision is supported by substantial evidence and whether the correct legal standard was used"). The Court must defer to the Commissioner's factual findings, so long as such findings are

---

[16] The ALJ failed to note that Dr. Hoekstra, in fact, diagnosed "rule out" learning disorder/ADHD.  Tr. 17–18

"supported by substantial evidence," but the Court's review of the Commissioner's conclusions of law is *de novo*. *See Sacilowski*, 959 F.3d at 437; *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a mere scintilla," and "means—and means only . . . 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consol. Edison*, 305 U.S. at 229). The Court will affirm the ALJ's findings, even if the record could support a different conclusion, when there is substantial evidence to support the ALJ's findings. *See Ortiz v. Sec'y of Health & Hum. Servs*., 955 F.2d 765, 769 (1st Cir. 1991); *accord Purdy*, 887 F.3d at 13.

A denial of benefits, however, will not be upheld if the Commissioner "has committed a legal or factual error in evaluating a particular claim." *Manso-Pizarro v. Sec'y of Health & Hum. Servs*., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting *Sullivan v. Hudson*, 490 U.S. 877, 885 (1989)). In particular, an ALJ's findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Sacilowski*, 959 F.3d at 437 (quoting *Nguyen v. Chater*, 172 F.3d at 35). "The ALJ cannot reject evidence for no reason, or for the wrong reason, and must explain the basis for his findings." *Crosby v. Heckler*, 638 F. Supp. 383, 385 (D. Mass. 1985). Accordingly, if an "ALJ fail[s] to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, le[aves] unresolved conflicts in the evidence, th[e] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F.

Supp. 179, 183 (D. Mass. 1998). "Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation." *Crosby*, 638 F. Supp. at 385–86.

## III.    DISCUSSION

At its crux, this case, which involves both physical and mental impairments,[17] concerns an ALJ's unfavorable disability decision which followed an initial favorable disability decision. The ALJ made these determinations without the benefit of any medical opinions regarding the functional limitations associated with either Plaintiff's physical and/or mental impairments and without any additional record development or opinions regarding Plaintiff's functional limitations.

Plaintiff argues the ALJ's decision should be reversed because the ALJ erred in: (1) failing to develop the record and in assessing his RFC; (2) evaluating his mental and cognitive impairments at steps two and four; (3) failing to evaluate the relevant listings regarding his mental impairments at step three; (4) evaluating his testimony; and (5) failing to add an RFC limitation regarding his need for special breaks and/or absences.[18]  *See* [ECF No. 11].  The Commissioner argues that the ALJ's decision is free of harmful legal error, supported by substantial evidence, and should be affirmed.  *See* [ECF No. 16].

---

[17] As discussed below, this case also involves a "rule out" cognitive impairment diagnosis of ADHD/learning disorder.  Tr. 615-16.

[18] The Court agrees with the Commissioner that Plaintiff mistakenly phrases this issue as an error regarding the ALJ's assessment of the VE testimony when it is, in fact, an issue regarding the ALJ's RFC assessment.

## A.  Preliminary Issue re Appeals Council's Findings and First ALJ Decision

At the outset, the Court notes that in conjunction with Plaintiff's discussion of another issue, he argues that the Appeals Council erred in its remand order findings regarding the gap in treatment evidence and Plaintiff's "almost full" recovery of use of his left arm and hand.  [ECF No. 11 at 14-15]; Tr. 114–15.  Plaintiff's opening brief, however, is unclear regarding the relief he seeks based on these errors.  [ECF No. 11 at 14-15 (arguing that the Appeals Council erred in its findings, and that "the record from that time [of the ALJ's first decision] shows otherwise and only served to further support the initial [f]ully [f]avorable decision")].

The Commissioner failed to address the Appeals Council's errors in opposition, other than to assert in a footnote that the ALJ's first decision is a "legal nullity."  [ECF No. 16. at 19 n.4].

In reply, Plaintiff contends that, contrary to the Appeals Council's finding otherwise, the medical evidence supported the ALJ's original favorable decision.  [ECF No. 19 at 8–9 (citing treating providers' observations of "moderate to severe tenderness, depression, weakness, pain, neuropathy, difficulty opening and closing hand, anger, feelings of hopelessness, feelings of worthlessness, irritability, isolation, rumination, and thoughts of hurting others" at Tr. 494–98, 501, 507, 512, 523, 539, 541–42, 558–59, 563, 568, 619)].  Plaintiff then appears to suggest that the Court should, in essence, revive the ALJ's original decision and find him disabled.  [ECF No. 19 at 9 (arguing that "[t]he initial rational[e] as offered by the ALJ, combined with the new evidence showing there was not sufficient improvement, supports a finding of disability")].  Alternatively, Plaintiff argues that "at a minimum, the [ALJ's] failure to sufficiently explain why the exact same evidence that previously supported a finding of disability no longer supported that finding requires remand."  [*Id.* at 9].

The Court cannot "revive" the ALJ's original decision, itself vacated by the Appeals Council, based simply on the Appeals Council's factual error(s). The current appeal before the Court is of the ALJ's second 2023 decision—*not* the Appeals Council's remand order. As such, the ultimate issue before this Court is "whether the [ALJ's] final [November 29, 2023] decision is supported by substantial evidence and whether the correct legal standard was used." *Sacilowski*, 959 F.3d at 437 (citation omitted).

Admittedly, this case is atypical in that the Appeals Council on its own motion reversed the ALJ's prior award of benefits, and, in doing so, the Appeals Council made at least one—and, very likely, two—erroneous factual findings.[19] The parties have not cited, and the Court was unable to find, a reported case with a similar procedural posture.

In many cases concerning the propriety of the district courts' review of Appeals Council orders, the Appeals Council has refused to review an ALJ's *unfavorable* decision, or it has refused to consider new evidence presented by a plaintiff in the first instance to the Appeals

_____

[19]In finding that there was a gap in Plaintiff's treatment between September 23, 2020, and March 15, 2022, the Appeals Council clearly erred when it overlooked exhibit 8F, which included records from five visits during that time period with Plaintiff's PCP, Dr. Farha, and NP LeMay. *See* Tr. 115 (overlooking *id.* at 553–73). The ALJ, by contrast, cited to those overlooked visit records in both of his decisions, including the November 2022 decision vacated by the Appeals Council. *See id.* at 106, 20–21.

The Appeals' Council's above error also appears to have led to its additional error when it subsequently found that "[t]he evidence indicates [Plaintiff] has largely recovered almost full use of his left arm and hand." Tr. 114–15. The medical evidence, including Dr. Bashir's visit records and the EMG results cited by the Appeals Council, however, did not demonstrate a "full" recovery. *See id.* at 115 (citing *id.* at 490-91, 579-80, 583). Notably, in making this finding, the Appeals Council overlooked the medical evidence from September 23, 2020, through March 15, 2022, which included visit notes contrary to the Appeals Council's finding. *See* [ECF No. 11 at 15 (citing numerous medical records from Plaintiff's PCP that were overlooked by the Appeals Council)].

Council.  *See, e.g.*, *Mills v. Apfel*, 244 F.3d 1, 5–7 (1st Cir. 2001).  As noted by the First Circuit in *Mills*, a court may disturb an Appeals Council's discretionary rulings only if the Appeals Council "gives an egregiously mistaken" reason.  *Id.*; *accord Lesieur v. O'Malley*, No. 23-cv-01022, 2024 WL 513702, at *1 (1st Cir. Feb. 8, 2024).  Even assuming, however, that the "egregiously mistaken" standard applies to the Appeals Council's remand order here, a finding that the Appeals Council's factual errors constituted "egregious" mistakes would not result in the relief Plaintiff seeks; nor would it, on its own, necessitate remand, for two primary reasons.

First, the Appeals Council cited to an additional legal error in reversing and remanding to the ALJ.  In other words, the Appeals Council's remand order did not rest simply on the factual errors highlighted by Plaintiff.

Specifically, the Appeals Council noted an additional error of law associated with the first VE, Rocco Meola's testimony.  Because the ALJ adopted VE Meola's testimony, this error impacted the ALJ's resulting step five findings.  Tr. 115.  As noted, in its remand order, the Appeals Council found that VE Rocco Meola's testimony was contrary to SSR 83-12 and the DOT.[20]  *Id.* (noting that SSR 83-12 "contemplates that even an individual who has lost the use of one upper extremity (arm) due to amputation or paralysis still has an occupational base between sedentary and light work," and that the DOT "identifies over [thirty] sedentary and light

---

[20] At the first September 26, 2022 hearing, the ALJ posed a hypothetical to VE Meola that mirrored the ALJ's assessed RFC.  Tr. 83–84, 105.  The ALJ asked VE Meola "to assume an individual of [Plaintiff's] age, education, and work experience," who was capable of light work and who had "no limitations with his right dominant [hand], but on his left non-dominant hand[,] he would be limited . . . to occasional" reaching, handling, and fingering.  *Id.* at 83.  VE Meola responded that such an RFC would "preclude work at the light, unskilled level."  *Id.* at 84.

unskilled occupations that could be performed even if both upper extremities were limited to occasionally reaching, handling, fingering[,] and feeling").

On remand, the ALJ received testimony from a different VE, Jay Steinbrenner.  Tr. 49–51.  VE Steinbrenner, unlike VE Meola, testified in response to an identical hypothetical from the ALJ that a claimant with the RFC assessed by the ALJ would be capable of work in the national economy – and offered three jobs in support of his testimony.[21]  *Id.*  This changed VE testimony regarding available jobs explains the differences in the ALJ's step five findings between his first and second decisions.  And, notably, on appeal, Plaintiff has not challenged the Appeals Council's finding regarding VE Meola's error;  nor has he challenged VE Steinbrenner's testimony regarding the availability of the three jobs.  *See* [ECF Nos. 11, 19].

Second, on remand, the ALJ both implicitly and explicitly rejected the Appeals Council's factual errors.  Close review of the ALJ's November 2023 discussion of the medical evidence and his evaluation of Plaintiff's RFC confirms that the ALJ did not adopt, nor did he agree with, the Appeals Council's erroneous findings challenged by Plaintiff.  Tr. 18.  Notably, the ALJ assessed an RFC identical to the RFC he assessed in his first fully favorable 2022 decision:  that is, light work with a limitation to "occasional" reaching, handling, and fingering with Plaintiff's "left upper extremity."  *Id.* at 18, 105.  The adoption of this RFC limitation confirms that the ALJ

---

[21]At the June 2023 hearing, the ALJ asked VE Steinbrenner whether "assum[ing] a light [RFC]" and a limitation on his "left side to occasional reach, handle, and finger," there were any jobs available for Plaintiff.  Tr. 50–51.  VE Steinbrenner responded that a claimant with those limitations could perform the jobs of usher/lobby attendant, school bus monitor, and stock checker.  *Id.* at 51.

did not agree with the Appeals Council's finding that Plaintiff had "largely recovered." *See id.* at 115.[22]

Additionally, the ALJ accurately rejected the Appeals Council's erroneous finding regarding a "gap" in Plaintiff's treatment from September 23, 2020, through March 15, 2022. *See* Tr. 114; *cf. id.* at 20.  As with his earlier decision, the ALJ cited treatment records from September 2021 and December 2021, which documented Plaintiff's reports at medical visits during that time of "left arm pain, neuropathy, weakness, [and] some difficulty opening and closing his hand."  *Id.* at 20 (citing *id.* at 558-571); *see also id.* at 106 (citing same records in 2022 decision).  The ALJ further noted that the examinations revealed "abnormal strength and weakness in the left arm, and tenderness in the left arm."  *Id.*

Accordingly, because the Appeals Councils' factual errors were not repeated by the ALJ in his second decision—the decision currently at issue before the Court—they have no impact on the Court's review of the ALJ's second decision.

The Court nevertheless declines the Commissioner's suggestion that it treat the ALJ's first decision as a "legal nullity" and ignore entirely its existence.  [ECF No. 16 at 19 n. 4].  The Court does not and has not relied on the ALJ's first decision on the merits or applied any preclusive effect to the ALJ's first decision given that it was subsequently vacated by the Appeals Council, and, as a result, never became final and binding.  *See Hastings v. Berryhill*, No. 17-cv-00084-JL, 2019 WL 1451982, at *3 (D.N.H. Mar. 27, 2019) (declining to apply *res judicata* to a decision vacated by the Appeals Council).  The Court is, however, permitted to and

---

[22] The ALJ's assessed RFC also was contrary to the Appeals Council's finding that "the available evidence [did] not support" a limitation "to only occasionally reaching, handling[,] and fingering with [Plaintiff's] left arm and hand."  Tr. 115.

has taken judicial notice of the fact that the same ALJ previously found Plaintiff disabled based on nearly identical evidence.[23] *See Greene v. Rhode Island*, 398 F.3d 45, 49 (1st Cir. 2005) (matters of public record such as prior litigation may be judicially noticed); *see also Rodi v. Southern New England School of Law*, 389 F.3d 5, 18–19 (1st Cir. 2004) (noting that the date a previous lawsuit in another court was commenced, the nature of that lawsuit, the date it was dismissed, and the basis for dismissal were "all susceptible to judicial notice" pursuant to Federal Rule of Evidence 201); *Gagne v. Kowalski*, 914 F.2d 299, 306 (1st Cir. 1990) (observing that "[i]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand" and affirming a district court's taking of judicial notice of a defendant's prior conviction in a subsequent civil case).

Accordingly, the question currently before the Court is whether the evidence before the ALJ in 2023—which included the new VE testimony, additional neurology visit records, Plaintiff's additional testimony, and Dr. Hoekstra's opinion—constituted substantial evidence in support of the ALJ's 2023 finding that Plaintiff was not disabled (contrary to his 2022 ultimate finding), and whether the ALJ correctly evaluated that evidence as a matter of law. That the same ALJ previously reached a different result on a nearly identical record does not on its own, compel a determination that the ALJ erred in his November 2023 decision.

The Court thus proceeds to its analysis of the issues raised by Plaintiff.

---

[23] As discussed in more detail below, that judicially noticed fact is, in particular, relevant to Plaintiff's challenges that the ALJ failed to adequately develop the record on remand and erred in assessing his RFC.

**B.    The ALJ Erred in Failing to Adequately Develop the Record and in the Step Four Analysis of Plaintiff's Pain and Physical Impairments.**

As noted above, on remand, the ALJ had *no* medical opinions regarding the functional limitations associated with Plaintiff's physical or mental impairments, thus assessing Plaintiff's RFC absent any medical opinions.  Plaintiff argues that the ALJ erred in failing to develop the record regarding the limitations associated with his impairments and in assessing his RFC absent further record development.

The Court addresses here Plaintiff's arguments regarding the ALJ's failure to develop the record—along with Plaintiff's related argument that the ALJ improperly assessed his RFC—as to Plaintiff's *physical* impairments and related pain.  The Court, however, finds that the record development and RFC issues –as they pertain to Plaintiff's *mental* and *cognitive* impairments – are intertwined with Plaintiff's other steps two and four challenges, and, therefore, has addressed those issues in the next section below when considering Plaintiff's mental and cognitive impairments.

As for his physical impairments, Plaintiff contends that the ALJ erred in failing to develop the record regarding his functional limitations when, contrary to the Appeals Council's remand order, the ALJ did not obtain a CE or ME opinion regarding those impairments on remand.  [ECF No. 11 at 14].  He argues that in assessing his RFC, the ALJ instead improperly relied on his own lay opinion in lieu of expert medical opinions.  [*Id.* at 14–15 (citing *Gordils v. Secretary of Health and Hum. Serv.*, 921 F.2d 327, 329 (1st Cir. 1990), and *Alcantara v. Astrue*, 257 F. App'x 333, 334 (1st Cir. 2007))].[24]  Plaintiff further contends that the ALJ's reversal of

---

[24] The First Circuit's holding in *Gordils*, 921 F.2d 327, is discussed in detail below.

his prior finding of disability—absent any additional expert medical opinions—was "particularly

egregious" given that the only post-remand January and July 2023 medical records from his

neurologist, Dr. Bashir, failed to undermine the ALJ's prior disability finding.  [ECF No. 11 at

15-16]; *see also* Tr. 589–90 (Dr. Bashir's January 2023 visit notes); *id.* at 618–19 (Dr. Bashir's

July 2023 visit notes).

The Commissioner counters that the Appeals Council did not require the ALJ to obtain a

CE or ME opinion on remand, and, thus, the ALJ did not violate the remand order.  [ECF No. 16

at 16].  The Commissioner further contends, in an attempt to limit or discredit the 1990 First

Circuit case, *Gordils*, 921 F.2d 327, as cited and relied on by Plaintiff, that, based on 1991

regulation changes, the RFC is no longer a "medical assessment" but is instead "an

administrative finding."  [ECF No. 16 at 16-18].  As a result, the Commissioner suggests that the

concerns present in *Gordils* in 1990—including ALJs "mak[ing] medical judgments which

require competence exceeding a lay person's knowledge" in assessing a claimant's RFC—are no

longer present in post-1991 cases.  [*Id.* at 17–18].  In support, the Commissioner notes legislative

history showing that the SSA replaced pre-1991 language referring to RFC assessments as

"medical assessments" with language explaining that an RFC is "an assessment based upon all of

the relevant evidence."  *Id.*

Finally, the Commissioner argues that the record here contains "relatively little physical

impairment," such that the ALJ was entitled to assess Plaintiff's RFC absent any medical

opinions.  [ECF No. 16 at 18-19 (citing *Mary H. v. O'Malley*, No. 23-cv-30003-KAR, 2024 WL

3464148, at *7 (D. Mass. Mar. 28, 2024))].  In support, the Commissioner cites to treatment

records that he contends supported the ALJ's RFC assessment, and argues that Plaintiff simply

seeks a reweighing of the evidence.  [ECF No. 16 at 17-19 (citing *Bellido-Benejan v. Comm'r*,

No. 19-cv-01994 (SCC), 2021 WL 4352791, at *4 (D.P.R. Sept. 24, 2021), and *Priest v. Colvin*,

No. 15-cv-00379-JHR, 2016 WL 7335583, at *1 (D. Me. Dec. 16, 2016))].

Plaintiff replies that despite the changes to the regulatory language over time, including

the 1991 changes highlighted by the Commissioner, "the principles remain[] the same." [ECF

No. 19 at 10]. Plaintiff acknowledges that the Commissioner is correct that the ALJs—not the

medical sources—are the ones ultimately responsible for adjudicating a claimant's RFC. *Id.*

However, in assessing a claimant's RFC, Plaintiff argues that the ALJs are required to follow the

regulatory scheme, which continues to recognize that ALJs are "lay persons who need to

properly rely on medical experts." *Id.*

The Court agrees with the Commissioner that while the Appeals Council required record

development "in order to complete the administrative record in accordance with the regulatory

standards regarding consultative examinations and existing medical evidence," the Appeals

Council did not specifically mandate that the ALJ obtain a CE or ME opinion on remand, but

instead left it to the ALJ to determine whether such opinions were "warranted and available" and

"necessary." Tr. 115–16. Accordingly, there is no violation of the rule of mandate.

Nevertheless, for the reasons that follow, the Court concludes the ALJ erred in failing to

develop and expand the record on remand to include medical opinions—ME, CE, or otherwise—

regarding Plaintiff's physical impairments prior to assessing his RFC and related functional

limitations.

The Commissioner's argument that the First Circuit's decision in *Gordils*, 921 F.2d 327,

was undermined by 1991 changes to the regulations is without merit and misses the mark

regarding the role of medical opinions in assessing disability in social security cases. *See*

*generally Richardson v. Perales*, 402 U.S. 389, 399–402, 408 (1971) (discussing generally the

nature of social security proceedings and the roles of the "hearing examiner" or ALJ and physicians who provide reports or opinions, and holding that "[t]he trial examiner is a layman; the medical adviser is a board-certified specialist . . . used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner," and is a "neutral adviser").

In *Gordils*, the First Circuit, reiterating prior holdings, stated that "since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity on a bare medical record." 921 F.2d at 329 (citing *Rosado v. Sec'y of Health and Hum. Servs.*, 807 F.2d 292, 293 (1st Cir. 1986); *Berrios v. Sec'y of Health and Hum. Servs.*, 796 F.2d 574, 576 (1st Cir. 1986); *Perez Lugo v. Sec'y of Health and Hum. Servs.*, 794 F.2d 14, 15 (1st Cir. 1986)). The *Gordils* court, however, added a caveat, explaining:

> This principle does not mean, however, that the Secretary is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the Secretary does not overstep the bounds of a lay person's competence and render a medical judgment. Obviously, speaking hypothetically, if the only medical findings in the record suggested that a claimant exhibited little in the way of physical impairments, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of sedentary work, the ALJ would be permitted to reach that functional conclusion himself.

921 F.2d at 329. The *Gordils* court then held that, in that case, the ALJ properly relied on two physician's "reports together" which themselves "constitute[d] substantial evidence to support [the ALJ's RFC] finding." *Id.*

Following *Gordils,* 921 F.2d 327, the First Circuit, along with numerous district courts within the circuit, including this Court, has applied the *Gordils* principle, reiterating that "an ALJ can only make the required RFC assessment without supportive expert opinion where the

evidence shows a 'relatively mild physical impairment posing, to the layperson's eye, [with] no significant restrictions.'" *Giandomenico v. Acting Comm'r*, No. 16-cv-00506-PB, 2017 WL 5484657, at *4–5 (D.N.H. Nov. 15, 2017) (quoting *Roberts v. Barnhart*, 67 F. App'x 621, 623 (1st Cir. 2003)) (citing numerous cases and quoting *Gordils*, 921 F.2d at 329, and *Manso-Pizarro*, 76 F.3d at 17); *see also Maniscalco v. Colvin,* 167 F. Supp. 3d 207, 217 (D. Mass. 2016) (holding that ALJ erred and remand was required for reconsideration of Plaintiff's mental impairments and related RFC where ALJ "rejected each and every opinion that exists in the record regarding the functional impact of [the claimant's] mental impairments," and instead, based his RFC findings on "the medical treatment notes and [the claimant's] testimony").

Many of the First Circuit cases applying the same principles and concerns elaborated in 1990 by the *Gordils* court, 921 F.2d 327, were decided *following* the 1991 regulation changes relied on by the Commissioner.  *See Roberts*, 67 F. App'x at 622–23 (quoting *Manso-Pizarro*, 76 F.3d at 17, and holding that "the general rule is that an expert is needed to assess the extent of functional loss," such that "[a]n ALJ may determine RFC only '[i]f th[e] evidence suggests a relatively mild. . . impairment posing, to the layperson's eye, no significant . . . restrictions'"); *Ormon v. Astrue*, 497 F. App'x 81, 84 (1st Cir. 2012) (citing *Manso-Pizarro*, 76 F.3d at 17, and holding that "since this is not a case involving a claimant with 'relatively little physical impairment,' the ALJ could not make an RFC assessment based on the bare medical record"); *see also Chantal E. v. Kijakazi*, No. 22-cv-00126-NT, 2023 WL 5123730, at *2 n.2 (D. Me. Aug. 10, 2023) (rejecting the same *Gordils*-type argument made by the Commissioner here—that "the judges of this District are misapplying the caselaw when they continue to cite First Circuit precedent on this point" because the First Circuit "has reiterated the principle at issue many times since the 1991 regulation change") (citing *Perez v. Sec'y of Health & Hum. Servs.*, 958

35

F.2d 445, 446 (1st Cir. 1991) ("[A]n ALJ is not qualified to interpret raw medical data in functional terms. We have held, accordingly, that where an ALJ reaches conclusions about claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence and it is necessary to remand for the taking of further functional evidence.")); *Manso-Pizarro*, 76 F.3d at 17–18 ("[T]he record contains no analysis of functional capacity by a physician or other expert. Thus, the question whether substantial evidence supports the ALJ's finding . . . depends on a qualitative assessment of the medical evidence that was before the ALJ.  If that evidence suggests a relatively mild physical impairment posing, to the layperson's eye, no significant exertional restrictions, then we must uphold the ALJ's finding; elsewise, we cannot (in the absence of an expert's opinion)."); *Nguyen v. Chater*, 172 F.3d at 35 ("The ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinions. . . . As a lay person, [he] was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination.")). Like the *Chantal E.* court, this Court similarly concludes that *Gordils*, 921 F.2d 327, and its progeny remain good law, and that "until the First Circuit says otherwise, that is the law we are bound to apply."  2023 WL 5123730, at *2 n.2.

Based on the above controlling legal standards, in assessing Plaintiff's RFC, the ALJ here "overstepped the bounds of [his] expertise as a layperson" by assessing RFC limitations that were based not on medical opinion evidence but "solely on his own interpretation of the medical evidence."  *Westhaver v. Astrue*, No. 09-cv-12032-DPW, 2011 WL 3813249, at *12 (D. Mass. Aug. 26, 2011); *see also Giandomenico*, 2017 WL 5484657, at *4–5 (quoting *Manso-Pizarro*, 76 F.3d at 17, and *Roberts*, 67 F. App'x at 622–23).

The Commissioner mistakenly suggests that in addition to the "progress notes," the ALJ "in this case" specifically relied on "consultative examination results" in formulating Plaintiff's RFC.  [ECF No. 16 at 17].  This, however, is not accurate as the ALJ did not obtain any consultative examinations regarding Plaintiff's physical impairments and pain– the absence of which constitutes one of the primary bases in support of Plaintiff's argument for remand to develop the record.[25]  Here, the absence of any such opinions distinguishes this case from the cases cited by the Commissioner, which themselves concerned the ALJ's evaluation of medical opinions and other visit records.  [*Id.* at 17-18]; *see Priest*, 2016 WL 7335583, at *1 (holding that ALJ harmfully erred in rejecting medical opinions from two state agency psychologists and one treating source regarding the severity of Plaintiff's mental impairments where the ALJ relied solely on other MSEs, and "there [was] no professional opinion to the contrary in the record"); *see also Bellido-Benejan*, 2021 WL 4352791, at *4 (finding that ALJ did not err in assessing Plaintiff's RFC where Plaintiff suffered from severe major depressive disorder, osteoarthritis, and lumbosacral spine and cervical spondylosis and the "ALJ relied on two medical opinions to determine Plaintiff's physical RFC and exertional capacity," such that "it [was] clear that the ALJ in fact used medical opinions to support Plaintiff's RFC").

Nor does this case fit the "narrow exception" to the rule prohibiting ALJs from interpreting raw data:  "namely, [that] an ALJ is not precluded from rendering common sense judgments about functional capacity based on raw medical evidence, as long as the ALJ does not

---

[25] As noted, Dr. Hoekstra, the sole psychologist opining regarding Plaintiff's mental impairments also did not opine regarding any functional limitations.  Tr. 613–16.

overstep the bounds of a lay person's competence."[26]  *Maniscalco*, 167 F. Supp. 3d at 217

(discussing *Gordils*, 921 F.2d at 329, and holding ALJ did not err in relying in part on the

opinion of a non-examining state agency physician to find that the claimant was capable of light,

as opposed to sedentary, work).  Here, unlike the claimant's mild COPD in the *Mary H.* case,

2024 WL 3464148, at *7, cited by the Commissioner, [ECF No. 16 at 18–19], the functional

limitations associated with Plaintiff's left median and ulnar neuropathy and his post-stab wound

and left arm surgery could not be considered so "apparent," as to permit the ALJ to assess the

requisite limitations using "'commonsense judgments' . . . within 'the bounds of a lay person's'"

eye.  *Giandomenico*, 2017 WL 5484657, at *4 (citing numerous cases and quoting *Gordils*, 921

F.2d at 329, and *Manso-Pizarro*, 76 F.3d at 17); *see also Roberts*, 67 F. App'x at 624 (citations

omitted) (holding that an ALJ can only make the required RFC assessment without supportive

expert opinion where "the evidence show[s] only a 'relatively mild physical impairment posing,

to the layperson's eye, no significant . . . restrictions'"); *cf. Mary H.*, 2024 WL 3464148, at *7

(concluding that Plaintiff's COPD, which included only sporadic flare-ups, was sufficiently mild

such that the ALJ did not err in assessing Plaintiff's RFC absent an expert medical opinion).

Unlike *Mary H.*, 2024 WL 3464148, at *7, Plaintiff's medical records confirm that he

continuously complained of chronic pain, numbness, and an inability to use his left hand and arm

as a result of the neuropathy and stab-related injuries the ALJ found to be severe from April

---

[26] The Court notes that the Commissioner additionally cites to treatment records that he contends
supported the ALJ's RFC assessment.  [ECF No. 16 at 18 (citing Tr. 533-54, 559, 563, 615, and
incorporating the additional record citations from the Commissioner's step two argument, ECF
No. 16. at 6)].  This argument and the supporting citations constitute an improper *post hoc*
rationalization given that the ALJ did not offer these reasons.  *See Polanco-Quinones v. Astrue*,
477 F. App'x 745, 746 (1st Cir. 2012) (per curiam) (concluding that court may not affirm agency
action based on grounds other than those offered by agency).

2020 through July 2023.[27]  *See* [ECF No. 16 at 18]; *see also* Tr. 548–49, 544–45, 464, 603–04,

599, 573, 562, 558-59, 490-91, 579–80, 589, 618.  As a result, this case is much closer to the

numerous cases in which courts have held that the extent of a claimant's functional limitations

was *not* readily apparent to a lay person but instead required an expert medical opinion.  *See*

*Valari M. v. Soc. Sec. Admin. Comm'r,* No. 18-cv-00342-JDL, 2019 WL 4277783, at *4 (D. Me.

Sept. 10, 2019) (citing *Gordils*, 921 F.2d 327, and holding ALJ erred in crafting the claimant's

mental impairment limitation based on MSE findings because the claimant's functional

limitations were not "commonsense," where he was diagnosed with mood disorder and major

depressive disorder but did not regularly receive therapy or care and had generally normal MSE

findings); *Staples v. Astrue*, No. 09-cv-00440-P-S, 2010 WL 2680527, at *3–4 (D. Me. June 29,

2010) (citing *Gordils*, 921 F.2d 327, and finding that ALJ erred where she "essentially rejected

all of the expert reports," and "in essence, . . .  crafted the finding of the [claimant's] mental RFC

from the raw treatment and assessment evidence of record"); *see also Joyner v. Colvin*, No. 13-

cv-122265 (MBB), 2014 WL 12769266, at *14 (D. Mass. Dec. 12, 2014) ("Even taking into

_____

[27] This case is also unlike *Chantal E.*, as cited by the Commissioner.  *See* [ECF No. 16. at 19
(citing *Chantal E.*, 2023 WL 5123730, at *3)].  There, the court affirmed some of the ALJ's
mental RFC limitations as supported by evidence in the record.  2023 WL 5123730, at *3.
However, the *Chantal* court did not provide the relevant, underlying facts regarding those
particular limitations, so it is unclear how that case compares on that point with the case at hand.
*Id.*  By contrast, though, it *is* clear from the *Chantal* court's decision that the court there rejected
additional RFC limitations assessed by the ALJ as "unsupported guesswork."  *Id.* at *4.  The
*Chantal* court held that the  ALJ's assessment of those limitations required "some medical
expertise" because they were "not . . . matter[s] of common sense," and the court reversed and
remanded to the ALJ.  *Id.* (holding that where ALJ "seemed to rely in part on his own
interpretation of the functional implications of [a doctor's] intelligence and memory testing," the
ALJ's "GED-level determination of what the [claimant] was capable of given her IQ and
memory test results [went] beyond a common-sense judgment").

account plaintiff's failure to seek mental health treatment, plaintiff's mental impairments, individually or collectively, were more than mild and the extent to which the impairments [a]ffect job performance is not apparent to a layman. A remand is therefore required."); *Westhaver*, 2011 WL 3813249, at *12 (disagreeing that commonsense exception existed where Plaintiff suffered both physical and mental impairments in an accident, and there was a "complex interplay of both physical and mental limitations"); *Oliveras v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 84, 91–92 (D. Mass. 2019) (holding that ALJ erred because "Plaintiff['s] scoliosis and Crohn's disease result[ed] in functional loss that would not be apparent to a lay person"); *Lwanga v. Saul*, No. 20-cv-10012-LTS, 2021 WL 769362, at *8 (D. Mass. Feb. 26, 2021) (holding that claimant's impairments were not "'so mild that they pose[d] no significant functional restrictions,' thereby permitting the ALJ to rely on his own lay assessment without a supporting expert opinion" (citation omitted)); *Giandomenico*, 2017 WL 5484657, at *4 (holding that ALJ erred when translating pulmonary test results into RFC limitations absent an expert medical opinion); *Bernier v. Colvin*, No. 14-cv-00178-JHR, 2015 WL 1780148, at *4 (D. Me. Apr. 17, 2015) (holding that ALJ, as a layperson, was not qualified to make a commonsense judgment regarding the functional limitations associated with the claimant's neuropathy).

For these reasons, the Court finds the ALJ erred in failing to develop the record regarding the functional limitations associated with Plaintiff's physical impairments and pain and in assessing Plaintiff's related RFC limitations without expert medical opinion(s). On remand, the ALJ must consult an ME and/or obtain a CE opinion regarding Plaintiff's physical limitations

and pain at step four and reevaluate his RFC with the assistance of relevant medical opinions and/or expertise.[28]

### C. The ALJ Erred in Failing to Adequately Develop the Record and in the Step Four Analysis of Plaintiff's Mental Impairments. Additionally, on Remand, the ALJ Should Consider Whether Plaintiff's Cognitive Impairments Constitute an MDI at Step Two.

Regarding his mental and cognitive impairments, Plaintiff challenges the ALJ's severity determination at step two, his failure to consider the relevant listings at step three, and his failure to adequately develop the record. The Court addresses separately below Plaintiff's mental and cognitive impairments and the ALJ's treatment of the mental and cognitive impairments.

#### 1. Legal Standards

Determining severity is a two-step process. *See* SSR 16-3p, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, at *3–8 (Oct. 25, 2017); *see also Forrette v. Saul*, No. 19-cv-30089, 2020 WL 5803166, at *10 (D. Mass. Sept. 29, 2020). Prior to determining whether an impairment is "severe," an ALJ is required to first ascertain whether the impairment constitutes "an underlying medically determinable physical or mental impairment(s) [("MDI")] that could reasonably be expected to produce an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *3; *see also* 20 C.F.R. § 416.921. MDIs are defined as, "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.921. The governing regulation, 20 C.F.R. § 416.921, emphasizes that:

---

[28]In doing so, the Court also notes that it has concluded below in its discussion of another issue raised by Plaintiff that the ALJ is required on remand to develop the record and reassess Plaintiff's likely absenteeism and time off task caused by his pain and medication side effects.

> [A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source. We will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).

*Id.*

The regulations provide that it is only "after [the ALJ] establish[es] that [a claimant] ha[s] a medically determinable impairment(s), [that he] determine[s] whether his impairment(s) is severe." 20 C.F.R. §§ 416.921, 404.1521; *see also* SSR 16-3, 2017 WL 5180304 at *3. In contrast to MDIs, "severity" is measured based on whether the MDI "significantly limits" the claimant's "ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c); *see also* 20 C.F.R. § 416.921; SSR 16-3p, 2017 WL 5180304 at *4.

With mental impairments, if the ALJ finds an MDI, the ALJ then must assess the degree of functional limitations resulting from the claimant's mental impairment with respect to the following functional areas: 1) the claimant's ability to understand, remember, or apply information; 2) the claimant's ability to interact with others; 3) the claimant's ability to concentrate, persist, or maintain pace; and 4) the claimant's ability to adapt or manage oneself. 20 C.F.R. § 416.920a(b)(2), (c)(3). These four factors are known as the "Paragraph B" criteria. *See id.*

Rating the degree of functional limitation pursuant to Paragraph B at step two is a highly individualized process that requires the ALJ to consider all relevant evidence to determine the extent to which a claimant's impairment interferes with his or her "ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c). The ALJ rates the degree of limitation in each of the four areas using a five-point scale: "None, mild, moderate, marked, and extreme." *Id.*

Finally, after determining the degree of functional limitation, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 416.920a(d). "[U]nless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities," a rating of "none" or "mild" generally means that a claimant's impairments are not severe.  *Id.*

Unlike an MDI determination, in assessing the severity of a claimant's impairment, an ALJ considers other evidence in addition to the objective medical records from acceptable medical sources.  *See* SSR 16-3p, 2017 WL 5180304, at *6.  In particular, an ALJ "will consider . . . statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms."  *Id.*  The ALJ evaluates the intensity and persistence of an individual's symptoms, including pain, to determine the extent to which the individual's symptoms limit her ability to perform work-related activities or to function independently.  *See id.* at *6–10.  An impairment or combination of impairments is "severe" if it significantly limits an individual's "physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

The severity policy is a "de minimis policy, designed to do no more than screen out groundless claims."  *McDonald v. Sec'y of Health & Hum. Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986).  The First Circuit has recognized that "[u]nder Social Security Ruling 85-28, a claim may be denied at step [two] for lack of a severe impairment only where medical evidence establishes only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."  *Barrientos v. Sec'y of Health & Hum. Servs.*, 820 F.2d 1, 2 (1st Cir. 1987) (per

43

curiam) (internal quotation marks and citation omitted) (discussing SSR 85-28, Titles II & XVI: *Medical Impairments That Are Not Severe*, 1985 WL 56856, at *3 (S.S.A. 1985)); *see also Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (noting that the purpose of step two is to identify claimants "whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account"); *McDonald*, 795 F.2d at 1124 (recognizing that "the [s]tep [t]wo severity requirement is . . .  designed to do no more than screen out groundless claims")

Moreover, an ALJ is required to again consider an MDI at step four of the sequential analysis regardless of whether the MDI is deemed "severe."  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (in assessing a claimant's residual function capacity, the SSA considers all medically determinable impairments—severe and non-severe); *see also Knowlton v. Saul*, No. 20-cv-00245, 2021 WL 9684351, at *4 (D.N.H. Mar. 29, 2021) (remanding where ALJ erred at step four when he failed to account for Plaintiff's lumbar impairment MDI); *Cooley v. Saul*, No. 19-cv-00679, 2020 WL 5406044, at *4–5 (D.N.H. Sept. 9, 2020) (ALJ's failure to consider non-severe impairments when addressing the RFC is reversible error); *Lavoie v. Colvin*, No. 15-cv-00209, 2016 WL 3554963, at *3 (D.N.H. June 24, 2016) (remanding when ALJ failed to consider non-severe impairments in addressing the RFC).

Where an ALJ errs in his step two severity assessment, the error will be considered "harmless as long as the ALJ considered that impairment in assessing [the claimant's] residual functional capacity at step four."  *Gruhler v. Berryhill*, No. 17-cv-00208-JD, 2017 WL 6512227, at *6 (D.N.H. Dec. 20, 2017); *Perry v. Astrue*, No. 11-cv-40215-TSH, 2014 WL 4965910, at *4 (D. Mass. Sept. 30, 2014) ("Here, any error at step two was harmless because the evaluation proceeded past step two and the [AC] considered all of the Plaintiff's impairments at step four.");

*see also Woodmancy v. Colvin*, 577 F. App'x 72, 74 n.1 (2d Cir. 2014) (even if ALJ failed to identify all severe impairments at step two, there is no reversible error where the ALJ considered the impact of all severe and non-severe impairments at step four).

### 2.    Analysis

#### a.    Mental Impairments

As noted, at step two the ALJ found that Plaintiff's mental impairments, including his major depressive order and PTSD, were not severe, and that Plaintiff possessed either no limitations or mild limitations in all four Paragraph B categories.  Tr. 17–18.  In support, the ALJ noted Dr. Hoekstra's July 2023 consultative examination, including Dr. Hoekstra's findings regarding Plaintiff's mini MSE test results, his limited mental health treatment in 2020, and his Wellbutrin prescription.  *Id.* at 17.  The ALJ also cited to Plaintiff's ability to leave the house to see friends on one occasion, his ability to control his anger at a party, and to his lack of mental health treatment after December 2020.  *Id.* (citing *id.* at 497–98, 501).

Regarding the Paragraph B factors, the ALJ found that Plaintiff had no limitation in his ability to understand, remember, or apply information; a mild limitation in his ability to interact with others; a mild limitation in his ability to concentrate, persist, or maintain pace; and a mild limitation in his ability to adapt or manage himself.  Tr. 17–18.  The ALJ based his assessment that Plaintiff had at most mild limitations in the four Paragraph B categories on evidence that: (1) Plaintiff was able to care for six children, play video games, and perform ADLs, citing *id.* at 491 (Dr. Bashir's March 2022 notes that Plaintiff's hand will go limp, freeze, or die when he is playing video games); *id.* at 523-25 (September 2020 therapy notes that Plaintiff "helps his fiancé care for her three kids from her previous relationship, one nephew, and the two children they have together"); *id.* at 534 (Plaintiff's September 2020 statement to therapist that "he helps

take care of the [six] kids in the home and is at his fiance's often in order to help with the kids");
(2) Plaintiff's therapists' notations that he was cooperative at his September 2020 appointment,
citing *id.* at 509–10, 533; (3) Plaintiff's October 2020 statements to his therapists that he was
able to see friends and attend a party, citing *id.* at 497–98, 501; (4) NP LeMay's December 2021
observation that Plaintiff had good judgment and normal mood, citing *id.* at 558; (5) Plaintiff's
November 2020 statement to his therapists "that he tried drawing as a coping skill twice," citing
*id.* at 541; and (6) Plaintiff's May 2022 prescription for Wellbutrin for his mood disorder, citing
NP Lemay's May 2022 visiting notes. *Id.* at 553.

Plaintiff argues that the ALJ erred at step two in determining that his mental impairments
presented only mild limitations in his social interactions and his ability to adapt and/or manage
himself, such that his mental impairments were not severe. [ECF No. 11 at 8–9]. In particular,
Plaintiff asserts that the ALJ relied on isolated incidents in support of these Paragraph B
findings. [*Id.*]. Plaintiff further contends that the ALJ also failed to adequately consider the
limitations regarding his PTSD and depression at step four in assessing his RFC limitations–
regardless of whether his mental impairments were severe. [*Id.* at 9].

The Commissioner counters that the ALJ properly found that Plaintiff's mental
impairments were not severe at step two based on his findings that Plaintiff possessed, at most,
mild limitations in the Paragraph B criteria.[29] [ECF No. 16 at 5-7]. The Commissioner further

---

[29] The Commissioner incompletely frames this Court's review of the ALJ's step two findings
simply as "whether substantial evidence supports the ALJ's [step two] finding that Plaintiff's
mental impairments did 'not significantly limit [his] . . . ability to do basic work activities.'"
[ECF No. 16. at 6 (citing 20 C.F.R. § 416.922(a))]. In doing so, the Commissioner fails to
adequately account for the *de minimis* standard that applies to the ALJ's step two determination
regarding whether an impairment is severe, as set forth above. *See Barrientos*, 820 F.2d at 2
(discussing SSR 85-28, 1985 WL 56856); *McDonald*, 795 F.2d at 1124; *Bowen*, 482 U.S. at 153.

suggests that Plaintiff erroneously "hones in" on one piece of evidence that the ALJ

misevaluated –his attendance at a party—when the ALJ relied on more than Plaintiff's party

attendance in finding that Plaintiff's social and adaptation limitations were mild.  *Id.*; Tr. 17–18.

Finally, the Commissioner cites to treatment records that he contends supported the ALJ's

Paragraph B findings.  [ECF No. 16 at 6,18].

　　　The Commissioner does not dispute that the ALJ failed to discuss Plaintiff's mental

impairment limitations during his step four analysis.  [ECF No. 16 at 9-10]; Tr. 18–22 (ALJ

discussion of step four).  Instead, the Commissioner argues that the ALJ's consideration of the

limitations associated with Plaintiff's mental impairments in conjunction with his Paragraph B,

step two analysis sufficed for the required step four RFC consideration.  [ECF No. 16 at 10

(citing *Furey v. Saul*, 501 F. Supp. 3d 29, 51–52 (D. Mass. 2020)].  In support, the

Commissioner argues that the ALJ's finding of mild limitations at step two, Paragraph B

necessarily translates into an absence of related RFC limitations at step four.  [ECF No. 16 at 9

---

As noted above, SSR 85-28, which governs medical impairments that are not severe, explicitly
required the ALJ here to find that the medical evidence "clearly established" that Plaintiff's
depression and PTSD were "not medically severe, i.e. d[id] not have more than a minimal effect
on [her] physical . . . ability(ies) to perform basic work activities."  1985 WL 56856, at *3.
Accordingly, in reviewing the ALJ's non-severity determination, the Court more accurately asks
"whether the ALJ had substantial evidence to find that [pursuant to SSR 85-28] the medical
evidence clearly established that [Plaintiff] did not have a medically severe [mental]
impairment."  *Glanden v. Kijakazi*, 86 F.4th 838, 844 (9th Cir. 2023) (quoting *Webb v. Barnhart*,
433 F.3d 683, 687 (9th Cir. 2005)); *accord Mohammad v. Astrue*, No. 10-cv-00254, 2011 WL
1706116, at *5 & n.13 (D.N.H. Apr. 4, 2011), report and recommendation adopted sub nom.
*Mohammad v. Soc. Sec. Admin.*, 2011 WL 1692390, at *5 n.13 (D.N.H. May 4, 2011) (agreeing
with *Webb*, 433 F.3d at 687, and stating that "an ALJ may find that a claimant lacks a medically
severe impairment only when his conclusion is 'clearly established by medical evidence'")
(citation and alteration omitted).  Pursuant to SSR 85-28, an "inconclusive medical record
[would have] preclude[d] denial at this step."  *Glanden*, 86 F.4th at 844 (discussing SSR 85-28,
1985 WL 56856).

(citing *John P. v. O'Malley*, No. 23-cv-00183-JDL, 2024 WL 1136774, at *1 (D. Me. Mar. 15, 2024), report and recommendation adopted, No. 23-cv-00183-JDL, 2024 WL 1435096 (D. Me. Apr. 3, 2024))].  Additionally, the Commissioner argues that Plaintiff failed to identify any specific mental functional limitations.[30]  [*Id.* at 10].  The Commissioner further offers additional *post hoc* rationalizations regarding Plaintiff's normal MSEs in support of his argument that Plaintiff did not possess any mental impairment limitations.  [*Id.* at 10-11].

        The Court declines to determine whether the ALJ's severity determination as to Plaintiff's mental impairments was adequate and supported by substantial evidence because it concludes that remand is necessary for another related reason that requires the ALJ to reconsider this step two severity determination.  As discussed below, regardless of any error with the ALJ's step two severity determination, the ALJ here failed to adequately consider the impact of Plaintiff's mental impairments (which the ALJ found constituted an MDI) on the assessed RFC at step four, as required.  *See* Tr. 17.  On remand, the ALJ must specifically consider whether and how Plaintiff's mental impairment limitations impact his RFC.  In doing so, further record development is required regarding the severity of Plaintiff's mental impairments and their limitations.

        *Furey*, the case relied on by the Commissioner regarding the adequacy of the ALJ's consideration of Plaintiff's mental impairments in conjunction with his RFC assessment is distinguishable.  [ECF No. 16 at 10 (citing *Furey*, 501 F. Supp. 3d at 51–52)].  In *Furey*, the ALJ found that Plaintiff suffered from non-severe back pain at step two.  501 F. Supp. 3d at 40.  Instead of discussing the functional limitations associated with Plaintiff's back pain at step four,

_____

[30] This is incorrect.  The Court refers the Commissioner to Plaintiff's testimony, as described earlier in this Order.

the ALJ discussed the functional limitations—which the ALJ to be not "significant" and of an insufficient duration—at step two. *Id.* at 51. The parties in the case agreed that the ALJ was required to consider the limitations related to Plaintiff's back pain in assessing his RFC. *Id.* at 51–52. This Court found that the ALJ's consideration of Plaintiff's back pain functional limitations at step two–instead of step four–sufficed given that it was "proper to read the ALJ's decision as a whole." *Id.* at 52 (citing *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[It is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses at [multiple] steps . . . . ") (alterations in original)).

The same is not true of Plaintiff's mental impairment limitations here. At step two, mental impairments, unlike the back pain at issue in *Furey*, 501 F. Supp. 3d 29, require a Paragraph B assessment, discussed above, and frequently described as "the psychiatric review technique (PRT)." SSR 96-8p, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *4 (July 2, 1996). Social Security Ruling 96-8p states that an ALJ's step two Paragraph B inquiry and findings regarding "an individual's limitations and restrictions from a mental impairment(s)" are distinct from the ALJ's evaluation of a claimant's mental RFC limitations at step four. *Id.* That SSR provides:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.*

*Id.* (emphasis added).

49

Accordingly, the Court agrees with the other district courts that have held that it cannot, as the Commissioner requests, simply assume that, here, the ALJ's step two, Paragraph B determination served as a substitute for the required RFC assessment regarding Plaintiff's mental impairments.  *See Jayne-Chandler v. Comm'r of Soc. Sec. Admin.*, No. 18-cv-00606-JL, 2019 WL 3543717, at *5 (D.N.H. Aug. 5, 2019) (citing SSR 96-8p, and quoting *Benoit v. Berryhill*, No. 18-cv-00061-SM, 2018 WL 6304353, at *8 (D.N.H. Dec. 3, 2018)) (noting that "the Paragraph B criteria and the RFC 'are two different things,'" such that "[a]fter Step 3, the ALJ no longer looks to the Paragraph B findings and instead draws from the medical expert opinion to assess a claimant's RFC"); *Swain v. Berryhill*, No. 18-cv-00145-PB, 2018 WL 5342714, at *6 (D.N.H. Oct. 29, 2018) (same).

Given the recognized differences between a Paragraph B and RFC assessment, this Court agrees with the multiple courts that have held that an assessment of mild Paragraph B limitations at step two does not excuse an ALJ from considering the impact of those limitations on a plaintiff's RFC at step four—especially in a pain case like this one, which involves both mental and physical impairments.  *See Lavoie*, 2016 WL 3554963, at *3–4 (overturning ALJ's decision where claimant's non-severe depression was not considered in conjunction with her severe impairments at step four); *Morse v. Colvin*, No. 14-cv-00018-LM, 2015 WL 1243169, at *8 (D.N.H. Mar. 17, 2015) (holding that ALJ erred when he discussed Plaintiff's mental impairments, including depression and panic disorder, at step two but failed to discuss them at step four in his RFC assessment); *Sharon J. v. Comm'r of Soc. Sec.*, 716 F. Supp. 3d 59, 65–66 (W.D.N.Y. 2024) (rejecting Commissioner's argument that an ALJ need not include mental limitations in an RFC finding where the ALJ found at step two, Paragraph B that the claimant had only mild mental limitations); *Jatava L. v. Comm'r of Soc. Sec.*, No. 1:20-cv-00772-MJR,

2021 WL 4452265, at *5 (W.D.N.Y. Sept. 28, 2021) ("[E]ven if the record did support a step-two finding that plaintiff's mental impairments were non-severe [with mild limitations], the ALJ was still obligated to consider those impairments in formulating the RFC."); *Grace M. v. Comm'r of Soc. Sec.,* No. 20-cv-1023SR, 2022 WL 912946, at *3 (W.D.N.Y. Mar. 29, 2022) ("An ALJ's failure to evaluate the extent to which mild limitations may or may not impact a plaintiff's ability to engage in substantial gainful employment constitutes legal error requiring remand."); *Coulter v. Comm'r of Soc. Sec.*, 673 F. Supp. 3d 365, 377–80 (S.D.N.Y. 2023) (citing numerous cases and holding that ALJ harmfully erred when he assessed mild mental limitations in a "thorough" Paragraph B analysis but failed to mention or discuss whether those mild limitations resulted in any RFC limitations); *Gomez v. Saul*, No. 19-cv-09278, 2020 WL 8620075, at *25 (S.D.N.Y. Dec. 23, 2020) ("[E]ven if an ALJ finds that a claimant's non-severe impairments result in only 'mild' restrictions, the ALJ must analyze those restrictions in determining the claimant's RFC."); *Laura Anne H. v. Saul*, No. 20-cv-00397 (TWD), 2021 WL 4440345, at *10 (N.D.N.Y. Sept. 28, 2021) (same).[31]

---

[31] The Court disagrees with *John P.*, as cited by the Commissioner. *See* 2024 WL 1136774. There, the court mistakenly equated the ALJ's finding that a mental impairment was not severe at step two, based on Paragraph B findings of "none" or "mild," with a step four RFC finding "that a claimant has *no* mental functional limitations." *Id.* at *3 (emphasis added); *cf.* SSR 96-8, 1996 WL 374184, at *4 ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment" than that used at Paragraph B, step two). In doing so, the *John P.* court cited to the regulation that allows the ALJ to end a step two severity determination without proceeding to a step three listings analysis when an impairment is not severe. 2024 WL 1136774, at *3 (citing 20 C.F.R. § 416.920a(d)). The regulation cited in *John P.*, 20 C.F.R. § 416.920a(d), does not, however, excuse an ALJ who finds a mental impairment to be non-severe from proceeding to the step four RFC assessment. *See, e.g.*, 20 C.F.R. § 416.945(a)(2) (in assessing a claimant's residual function capacity, the SSA is required to consider even those medically determinable impairments that are considered "non-severe" at step two).

Here, the ALJ's boilerplate statement acknowledging that the paragraph B criteria were not an RFC assessment does not change the result, where "in practice," the ALJ failed to consider Plaintiff's non-severe mental impairments in assessing his RFC.  Tr. 18; *see Aponte-Morales v. Comm'r of Soc. Sec.*, No. 19-cv-01563, 2021 WL 3879451, at *8 (D.P.R. Aug. 31, 2021) (holding that "[a] boilerplate assertion without analyzing impairments in the RFC determination is insufficient"); *accord Smith v. Saul*, No. 18-cv-01086, 2019 WL 5957294, at *4 (D.N.H. Nov. 13, 2019) (quoting *Lavoie*, 2016 WL 3554963, at *4) ("This court has consistently ruled that a 'boilerplate assertion that an ALJ considered all of the claimant's impairments in combination, without describing any actual analysis, is insufficient'").[32]

Second, the ALJ's error in failing to properly consider Plaintiff's mental limitations at step four also was not remedied by the ALJ's finding that Plaintiff's *physical* impairments were severe and the ALJ's continuation of the sequential analysis as to the impact of those mental impairments.  The limitations associated with Plaintiff's physical impairments, as considered by the ALJ at step four, were distinct from those associated with Plaintiff's mental impairments.  Thus, the ALJ's error regarding Plaintiff's mental impairments could not be remedied merely by continuing the sequential analysis as to the physical impairments.  *See Aponte-Morales*, 2021 WL 3879451, at *7.

On remand, in order to properly consider the RFC limitations associated with Plaintiff's mental impairments, the ALJ is required to further develop the record by obtaining a CE and/or ME testimony regarding the severity and limitations associated with Plaintiff's mental

---

[32] The Court notes that "[e]ven though an ALJ is . . . not required to find a limitation for each impairment, each impairment must at the very least be *considered* in the assessment of the RFC." *Aponte-Morales*, 2021 WL 3879451, at *8.

impairments.[33] After developing the record, the ALJ should reconsider his step two severity determination in light of the expanded record.  Additionally, the ALJ must consider at step four the limitations associated with Plaintiff's mental impairments – regardless of whether the ALJ determines them to be severe or non-severe at step two.

### b.    Cognitive Impairments

Plaintiff also argues that the ALJ erred in failing to mention, let alone consider, his learning disorder/ADHD at step two in light of Dr. Hoekstra's diagnosis and his testimony regarding his difficulty concentrating.  [ECF No. 11 at 9].  The Commissioner counters that Plaintiff waived the issue with his "perfunctory" argument.  [ECF No. 16 at 8].  In reply, Plaintiff contends that he did not waive the issue, arguing that he was unable to provide any more in-depth argument than what he did because the ALJ himself provided no analysis.  [ECF No. 19 at 2].

Plaintiff's argument, albeit succinct, was sufficient.  He correctly noted in his opening brief that "[t]he ALJ did not even discuss whether [his] learning disorder/ADHD was severe or non-severe," suggesting that this failure was error given "the diagnosis by the CE and the testimony from Plaintiff about his difficult concentrating."  [ECF No. 11 at 9].  Accordingly, the Court addresses the issue on the merits.

The Commissioner notes that CE Dr. Hoekstra simply offered a "rule out diagnosis," premised on Plaintiff's self-reports, and argues that neither a diagnosis alone— nor a self-report of symptoms— is sufficient to establish an MDI.  [ECF No. 16 at 9].

---

[33] As noted, for unknown reasons, the CE opinion from Dr. Hoekstra, ordered previously by the ALJ, failed to do so.  Additionally, neither state agency psychologist opined regarding Plaintiff's functional limitations.

In reply, Plaintiff puts the cart before the horse, suggesting that 20 C.F.R. § 416.945(a)(2), which governs an ALJ's consideration of Plaintiff's MDIs, required the ALJ to consider his ADHD.  [ECF No. 19 at 2].  Plaintiff further contends that the Commissioner's *post hoc* rationalizations regarding his subjective reporting as to the ADHD are without merit, asserting that "[t]he symptomology of mental conditions, such as ADHD, is typically subjective by nature."  [*Id.* at 2-3].

Neither party cited any authority addressing the ALJ's duty to consider whether a rule out diagnosis constitutes an MDI.  Nor did the parties cite to any authority regarding the ALJ's duty to develop the record regarding rule out diagnoses.

The First Circuit does not appear to have addressed either issue, and, as set forth below, the courts are split regarding whether a rule out diagnosis triggers an ALJ's duty to develop the record to determine whether the impairment constitutes an MDI or a severe impairment.  This Court agrees with the multiple courts that have found that a rule out diagnosis is typically not sufficient in and of itself to establish the existence of an MDI and/or to trigger the ALJ's duty to develop the record.  *See Coleman v. Astrue*, No. 09-cv-00008-P-H, 2009 WL 3517583, at *2 (D. Me. Oct. 29, 2009) (relying on Eighth Circuit case, *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993), in holding that ALJ had no duty to develop record regarding rule out diagnosis of borderline intellectual functioning); *see also Doran v. Colvin*, No. 14-cv-01669-VJE, 2016 WL 4942001, at *11 (D. Or. Sept. 15, 2016) (citing Eighth Circuit case, *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012), and holding that "[a] "rule-out" diagnosis does not constitute an actual diagnosis); *but see Johnson v. Barnhart*, 312 F. Supp. 2d 415, 426–27 (W.D.N.Y. 2003) (ALJ did not fulfill duty to develop record where medical records indicated sleep apnea needed to be ruled out as a potential diagnosis and ALJ did not seek further information); *Rivera v. Barnhart*,

54

No. 00-cv-08315-IAGSJC, 2002 WL 221591, at *2 (S.D.N.Y. Feb. 11, 2002) (ALJ erred at step two by not performing further investigation into whether claimant suffered from mental retardation where one doctor diagnosed claimant with "r/o mental retardation").

The Court instead concludes that where the record contains additional evidence suggesting that a claimant suffers from the rule out condition or impairment, the rule out diagnosis gives rise to an ALJ's duty to develop the record further to determine whether there is an MDI. *See Rosa v. Comm'r of Soc. Sec.*, No. 17-cv-03344-NSRJCM, 2018 WL 5621778, at *14 (S.D.N.Y. Aug. 13, 2018) (holding that although psychiatrist's "'rule out' diagnosis would not have definitively established that Plaintiff suffered from a mood disorder, it would have 'raised the possibility that [Plaintiff] did, creating an obvious gap in the record requiring further investigation by the ALJ,'" and reversing and remanding where ALJ failed to develop the record on the issue); *Timmons v. Berryhill*, No. 16-cv-06314 (MAT), 2017 WL 2821558, at *3 (W.D.N.Y. June 30, 2017) (holding that ALJ erred in failing to develop the record regarding a rule out diagnosis of mild neurocognitive disorder, and noting that "ALJ had many options available to her to develop the record, including engaging a medical expert to review plaintiff's CT scans and determine whether they supported a diagnosis of neurocognitive disorder, or re-contacting [the claimant's physician] to obtain additional information"); *Dschaak v. Astrue*, No. 10-cv-01010-PK, 2011 WL 4498832, at *18–19 (D. Or. Aug. 15, 2011), report and recommendation adopted, No. 10-cv-01010-PK, 2011 WL 4498835 (D. Or. Sept. 27, 2011) (holding that remand was required for ALJ to develop record regarding rule out diagnoses of cognitive disorder); *Sweet v. Berryhill*, No. 15-cv-00866 (MAT), 2018 WL 1026230, at *5 (W.D.N.Y. Feb. 23, 2018) (holding that ALJ erred where he "determined at step two that Plaintiff's alleged PTSD and OCD were not medically determinable impairments, without noting

or discussing [the psychiatrist's] 'rule out' diagnoses, and apparently without attempting to further develop the record as to the existence of the[] claimed conditions").

      Having already determined that remand on other grounds is necessary, the Court finds that, on remand, the ALJ is required in conjunction with his step two analysis to explicitly address whether Plaintiff's ADHD/learning disorder constitutes an MDI.[34]  In doing so, the ALJ must also consider whether the rule out diagnosis, along with the other record evidence, warrants further development of the record on the existence and severity of ADHD/learning disorder.

      The Court notes that its own review suggests that additional record support for Dr. Hoeskstra's rule out diagnosis of ADHD/learning disorder is sparse.  In support of the rule out diagnosis, Dr. Hoekstra stated that Plaintiff "endorsed a history of ADHD and reported a lot of distractibility."  Tr. 615.  She further noted that, for Plaintiff, "learning was easy but paying attention was hard due to ADHD," and that Plaintiff stated that he was diagnosed and on medication for ADHD while in school but was not in special education classes.  *Id.*

      Plaintiff cites to his June 2023 testimony regarding his difficulty focusing as evidence that he suffered from a learning disorder/ADHD.  [ECF No. 19 at 2 (citing Tr. 48)].  It appears to the Court, though, that Plaintiff's testimony regarding his difficulty concentrating or focusing related to the side effects of the pain and his medications – as opposed to an additional cognitive impairment.  See Tr. 48 (noting that he can no longer draw because he cannot "focus long enough" and because he is unable to "draw a straight line" due to the pain).

---

[34] The ALJ will need to address the severity of the ADHD/learning disorder only if the ALJ finds it constitutes an MDI.

The Court thus defers to the ALJ to determine on remand, based on the above, whether additional record development regarding Dr. Hoekstra's ADHD/learning disorder rule out diagnosis is warranted in connection with the ALJ's step two MDI evaluation.

### D.    ALJ's Step Three Listings Evaluation – Mental Impairments

Plaintiff also argues that the ALJ erred in failing to compare his mental impairments with the listings for depression and PTSD.  [ECF No. 11 at 9–10].  This argument, however, presupposes that the ALJ erred in his finding that his mental impairments were not severe.  *See* 20 C.F.R. § 416.920a(d)(1)&(2) (If an ALJ rates all Paragraph B category limitations as "none" or "mild," the ALJ typically "conclude[s] that [the claimant's] impairment(s) is not severe" and need not proceed to the step three listings analysis; by contrast, if the ALJ determines the mental impairment is severe, the ALJ proceeds to determine whether a mental impairment "meets or is equivalent in severity to a listed mental disorder").  As noted, given the record development and reconsideration of the mental impairments required on remand, the ALJ will be required to revisit his step two severity determination in light of the expanded record.

Accordingly, for the same reasons that the Court declines to adjudicate the severity of Plaintiff's mental impairments at step two, the Court also declines to decide whether a step three listing analysis is required.  The necessity of a step three listing comparison on remand will depend on the ALJ's step two, Paragraph B assessment of the severity of Plaintiff's mental impairments.  *See* 20 C.F.R. § 416.920a(d)(1)&(2).

### E.    ALJ's Evaluation of Plaintiff's Testimony re His Mental and Physical Impairments

Plaintiff also argues that the ALJ erred in discounting his subjective symptom testimony, as set forth above.

The Court has already determined that remand is appropriate for further development of the record regarding both Plaintiff's physical and mental impairments and for reassessment of the RFC limitations associated with his physical and mental impairments. In light of the additional proceedings and expanded record on remand, the Court notes that the ALJ will necessarily be required to revisit his evaluation of Plaintiff's testimony as well. The Court, however, addresses Plaintiff's current arguments regarding the ALJ's November 2023 evaluation of his testimony so that the ALJ may correct additional errors as discussed below and/or clarify his findings, as warranted.

In his November 2023 decision, the ALJ acknowledged Plaintiff's testimony regarding his physical impairments and pain and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 19. The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects" were "not entirely consistent with the evidence for two main reasons." *Id.*

First, the ALJ found that Plaintiff had "not generally received the type of medical treatment one would expect for a totally disabled individual." Tr. 19. In support, the ALJ found that Plaintiff's "surgery relieved some of his symptoms;" that Gabapentin has "been relatively effective in controlling [Plaintiff's] . . . electric shock-like pain in his arm;" and that his medical examination findings—specifically, the "left digit" findings—were not consistent with the record. *Id.* at 19–20 (citing *id.* at 489-91, Dr. Bashir's March 15, 2022 visit notes; *id.* at 589-90, Dr. Bashir's January 12, 2023 visit notes).

Second, the ALJ found Plaintiff's testimony inconsistent with his ADLs, citing Plaintiff's therapist's September 2020 visit notes, which stated that Plaintiff was "still able to use his other arm and complete his [ADLs], though he experiences pain," and that Plaintiff "helps take care of

58

the [six] kids in the home." Tr. 20 (citing *id.* at 525, 534). Additionally, the ALJ cited Dr. Bashir's March 2022 visit notes in which Dr. Bashir described how Plaintiff's hand "dies" or goes "limp" when playing a video game. *Id.* (citing *id.* at 490).

The ALJ, however, did not address or acknowledge Plaintiff's testimony regarding his mental impairments, other than to note that Plaintiff "reported irritability and increased stress due to not being able to provide for his family." Tr. 19. The ALJ also did not provide any reasons for discounting or rejecting Plaintiff's mental impairment testimony. *See id.* at 20.

Plaintiff argues that neither of the above two reasons offered by the ALJ constituted a sufficient basis for discounting his physical impairment testimony. [ECF No. 11 at 13–14]. Regarding the first reason – that Plaintiff's treatment was not what "one would expect for a totally disabled person"—Plaintiff argues that the reason constituted an unacceptable lay opinion, noting that, contrary to the lay opinion, he underwent surgery, was taking his prescribed medications, and had a treating neurologist who stated that his condition was unlikely to be cured. [*Id.* at 13-14 (citing Tr. 619)]; Tr. 19.

The Commissioner counters that this reason for rejecting Plaintiff's testimony was not limited to the single statement highlighted by Plaintiff and that the ALJ also cited medical evidence. [ECF No. 16 at 15].

As for the ALJ's second reason, Plaintiff's ADLs, Plaintiff argues that the ALJ erred in relying on his childcare because, as he testified, his provision of childcare was limited by his condition. [ECF No. 11 at 13 (citing Tr. 40, 48)]. Additionally, Plaintiff notes that, contrary to the ALJ's finding, the record evidence and testimony shows that he was, in fact, unable to play video games due to the pain and his hand "freez[ing] up." *Id.* (citing Tr. 37, 48, 490).

The Commissioner counters, however, that the ALJ did not use Plaintiff's ADLs to demonstrate that he was not disabled.  [ECF No. 16 at 15].  Instead, the Commissioner argues that the ALJ used Plaintiff's ADLs to support a negative credibility finding.  *Id.*

"[A]n ALJ must consider a claimant's subjective allegations of functional limitations, but [he] is not required to take those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living."  *Richards v. Kijakazi*, 554 F. Supp. 3d 242, 252 (D. Mass. 2021) (citing *Frustaglia v. Sec'y of Health & Hum. Servs.*, 829 F.2d 192, 194–95 (1st Cir. 1987); *Avery v. Sec'y of Health & Hum. Servs.*, 797 F.2d 19, 22–23 (1st Cir. 1986); *Winn v. Heckler*, 762 F.2d 180, 181 (1st Cir. 1985); and 20 C.F.R. §§ 404.1529, 416.929)).  "In evaluating a claimant's symptoms, the ALJ first 'consider[s] whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce' those symptoms, and then 'evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.'"  *Stafford v. Saul*, 564 F. Supp. 3d 1, 7 (D.N.H. 2020) (alterations in original) (quoting SSR 16-3p, 2016 WL 1119029, at *4); *see also* SSR 16-3p, 2017 WL 5180304, at *3 (same).[35]  While the ALJ may "not disregard an

---

[35] The *Stafford* Court cited to the original version of SSR 16-3p, dated March 16, 2016.  *See* 564 F. Supp. 3d at 7 (discussing SSR 16-3p, 2016 WL 1119029, at *4).  On October 25, 2017, however, the SSA "republished" SSR 16-3p, and the operative version is now found at 2017 WL 5180304, as cited above in this order.  In the 2017 republication, the SSA clarified that republished SSR 16-3p simply "changed [its] terminology from 'effective date' to 'applicable date' based on guidance from the Office of the Federal Register" and "updated citations to reflect the revised regulations that became effective on March 27, 2017."  2017 WL 5180304, at *1.  The SSA clarified that the "Ruling [was] otherwise unchanged" in its "guidance about how we evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI of the Social Security Act."  *Id.*  Accordingly, given the

individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual," that is "one of the many factors" the ALJ may consider. *Stafford*, 564 F. Supp. 3d at 7 (quoting SSR 16-3p, 2016 WL 1119029, at *5)*; see also* SSR 16-3p, 2017 WL 5180304, at *5 (same).

The First Circuit requires ALJs to consider the so-called "*Avery* factors," which are the "claimant's daily activities, functional restrictions, non-medical treatment, medications and side-effects, precipitating and aggravating factors, and the nature, location, onset, duration, frequency, radiation, and intensity of the symptoms." *Richards*, 554 F. Supp. 3d at 252 (citing *Avery*, 797 F.2d at 28–29). An ALJ, however, "is not required to discuss each of the *Avery* factors in order to sufficiently support a credibility determination." *Id.* (citing *Foley v. Astrue*, No. 09-cv-10864, 2010 WL 2507773, at * 7 (D. Mass. June 17, 2010)). Instead, "[a]s long as the *Avery* factors are explored during the administrative hearing and the ALJ provides specific reasons for any adverse credibility assessment, the ALJ complies with *Avery* and his findings are entitled to deference." *Stafford*, 564 F. Supp. 3d at 7 (quoting *Tellier v. Comm'r*, No. 17-cv-00184, 2018 WL 3370630, at *7 (D.N.H. July 10, 2018)).

Turning to the ALJ's reasons in this case, the Court agrees with Plaintiff that the ALJ's second reason mischaracterized the evidence regarding his ADLs because the post-2020 medical evidence, in fact, suggested that Plaintiff was limited in his ability to provide childcare and that he was unable to play video games due to his hand freezing. *See* Tr. 603, 490, 618–19, 615, 80-

---

identical substantive standards in the two versions, the *Stafford* Court's citation to the 2016 version of SSR 16-3p as opposed to the 2017 version is of no import.

82, 41-42, 70-71.  Additionally, the Court disagrees with the Commissioner's *post hoc* characterization of the ALJ's ADL findings as a negative credibility finding—as opposed to a finding undermining the existence of a disability.  Contrary to the Commissioner's suggestion otherwise, the ALJ made no findings regarding malingering or credibility on Plaintiff's part, including with respect to Plaintiff's ADLs.  *See id.* at 19–20.

By contrast, the ALJ's first reason—the medical evidence cited in support of his rejection of Plaintiff's physical impairment testimony—presents a closer call.  The Court notes, though, that in citing to evidence regarding the effects of treatment on Plaintiff's physical impairments and to physical examination findings, the ALJ failed to address other less favorable evidence. *See* Tr. 19–20.  Notably, this included evidence that although Plaintiff had surgery and was treated with medications, his treatment did not alleviate all of Plaintiff's pain, namely, his muscular pain.  *See id.*  Moreover, as discussed in more detail below, the ALJ also did not address Plaintiff's inability to take an increased dose of Gabapentin due to the side effects.  The ALJ should address both of these issues in reevaluating Plaintiff's physical impairment testimony on remand.

Furthermore, given that the ALJ failed to evaluate Plaintiff's testimony as to his mental impairments, on remand, the ALJ must also assess in the first instance Plaintiff's testimony regarding his mental impairments and symptoms.

**F.    The ALJ Erred at Step Four in Failing to Adequately Consider the Side Effects of Plaintiff's Medication and the Need for an RFC Limitation Related to Absenteeism and/or Time Off-Task.**

Plaintiff also argues that the ALJ's analysis of the VE's testimony was flawed because the ALJ failed to address evidence regarding his likely absenteeism and time off-task.[36]  [ECF No. 11 at 10–11].  As noted above, Plaintiff frames this issue incorrectly.  The Court properly rephrases the issue as whether the ALJ erred in failing to consider and assess a time off-task and/or absenteeism limitation with Plaintiff's RFC at step four.

Plaintiff argues that the record evidence regarding his daytime sleepiness, as caused by Gabapentin, along with his pain, demonstrates that he would have been off-task or absent more than permitted by an employer.  [ECF No. 11 at 11 (citing Tr. 47–48, 613–14, 619)].  Plaintiff thus argues that remand is required because the ALJ failed to address such a limitation in assessing his RFC.  *Id.*

The Commissioner counters that the absence of any medical opinions opining to such a limitation renders the issue an "uphill climb" for Plaintiff.  [ECF No. 16 at 12].  The Commissioner further notes that the ALJ generally discounted Plaintiff's testimony, which he argues may be interpreted as a rejection of the necessity for time off-task and/or absenteeism limitations.  [*Id.* at 13].

Additionally, the Commissioner contends that the record "contains only spar[s]e mention of Plaintiff's transient, self-reported side effects."  [ECF No. 16 at 13 (citing *De Jesus v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1440, 1992 WL 137507 (1st Cir. 1992) (unpublished table

---

[36] At the June 2023 hearing, VE Steinbrenner testified that an employee whose impairment or symptoms resulted in their being off task more than fifteen percent of the time or absent two or more days per month on an "ongoing basis" would not be employable.  Tr. 52, 55.

decision))].  He asserts that "[t]iming is key" to the issue, and that "[t]here is nothing to suggest [Plaintiff] experienced side effects" while at the lower 300 mg and 600 mg dosages of Gabapentin that he took prior to January 2023.  [ECF No. 16 at 13].  The Commissioner concedes that there was medical evidence (in addition to Plaintiff's testimony) that when Dr. Bashir increased Plaintiff's Gabapentin to 900 mg in January 2023, Plaintiff experienced side effects, but notes that in July 2023, Dr. Bashir decreased Plaintiff's dosage to 600 mg to mitigate the side effects.  [*Id.* at 14].  Therefore, the Commissioner characterizes the side effects as a "short-lived occurrence" such that the ALJ did not err.  [*Id.* (citing *Rivera Velez v. Sec'y of Health & Hum. Servs.*, 976 F.2d 724, 1992 WL 225977  (1st Cir. 1992) (unpublished table decision))].[37]

In reply, Plaintiff argues that the Commissioner's arguments regarding the timeline associated with his prescribed Gabapentin dosages constitutes a *post hoc* rationalization given that the ALJ did not address the side effect evidence at all.  [ECF No. 19 at 5].  Plaintiff further contends that the Commissioner's acknowledgment that he was unable to tolerate Gabapentin at higher doses actually supports a finding of disability since the record shows that his pain was inadequately controlled by the lower dose.  [*Id.* at 5-6].  Plaintiff additionally argues that there is medical evidence – not just hearing testimony—regarding Plaintiff's fatigue and sedation.  [*Id.* at 5 (citing *Ogannes B. v. Kijakazi*, No. 22-cv-00325-WES, 2023 WL 5561108, at *1 (D.R.I. Aug. 29, 2023))].

---

[37] *Rivera Velez* is distinguishable because, there, the court found that the ALJ explicitly considered the claimant's side effects.  1992 WL 225977, at *3 (noting that "the ALJ specifically acknowledged claimant's testimony that his medications make him nervous and agitated").

The Court agrees that the ALJ erred in failing to inquire further regarding Plaintiff's medication side effects and to consider the impact of side effects on Plaintiff's RFC limitations, assuming that the lower does was not effective.

"When the symptoms of an impairment or combination of impairments would cause the claimant periodically to be unable to attend work, it is reversible error if the ALJ fails specifically to assess the issue of absenteeism" or time required off-task. *Jacquelyn V. v. Kijakazi*, No. 21-cv-00314-MSM, 2023 WL 371976, at *5 (D.R.I. Jan. 24, 2023), adopted by text order (D.R.I. Mar. 7, 2023) (quoting *Amanda S. v. Berryhill*, No. 18-cv-00001-JJM, 2019 WL 1316979, at *6–7 (D.R.I. Mar. 22, 2019), accepted by Text Order (D.R.I. Apr. 8, 2019) (directing award of benefits), *affirmed sub nom. Sacilowski*, 959 F. 3d at 431 (error to fail to consider probable absenteeism caused by migraines that recur despite medication)) (noting ALJ's failure to consider the impact that Plaintiff's "need to lie down in the dark for an unspecified amount of time" would have on her attendance and on the ALJ's RFC assessment); *see also Sacilowski*, 959 F.3d at 435–36 (holding that it was error for an ALJ to ignore the impact of Plaintiff's pain on her attendance, particularly where it was "undisputed that [the claimant's medical] issues required ongoing treatment throughout [an extended period]").

Here, both the controlling regulation and the SSR that governed the ALJ's evaluation of Plaintiff's symptoms explicitly required the ALJ to consider the "type, dosage, effectiveness, and side effects of any medication" Plaintiff took "to alleviate [his] pain or other symptoms." *See* 20 C.F.R. §§ 416.929(c)(3)(iv), 404.1529; *see also* SSR 16-3p, 2017 WL 5180304, at *8 (noting that ALJ must consider "type, dosage, effectiveness, and side effects of any medication" in "evaluating the intensity, persistence, and limiting effects of [a claimant's] symptoms").

Under similar facts, the First Circuit, held that where a claimant "testified that the medication required to control his epilepsy ma[de] him so sleepy, hot, and ill-tempered as to disable him from working," that, "[a]t the very least, the [ALJ] should have made a finding on [the plaintiff's] claim regarding side effects, making it possible for a reviewing tribunal to know that the claim was not entirely ignored." *Figueroa v. Secretary of Health, Educ. & Welfare*, 585 F.2d 551, 553-54 (1st Cir. 1978). In so holding, the *Figueroa* court explicitly acknowledged that, other than the claimant's testimony, the "record contain[ed] no medical evidence regarding . . . whether [Plaintiff's medication's] side effects might conceivably be disabling." *Id.* Nevertheless, the *Figueroa* court ultimately reversed and remanded based on the ALJ's failure to address or inquire about evidence of the claimant's disabling side effects from seizure medication, noting that "[i]t would have been appropriate for the [ALJ] to have sought further medical evidence, or to have made some further inquiry, since [the claimant] raised the question." *Id.* at 554.

By contrast, in a subsequent case following *Figueroa*, the First Circuit reached a different result, holding that it was "in no way troubled by a claimant's objection that the ALJ impermissibly ignored her testimony that the side effects of her medications made her too sleepy to engage in work activity" where "[t]here was no mention of this problem anywhere in the medical evidence." *De Jesus*, 1992 WL 137507, at *3.[38]

Following *Figueroa* and *De Jesus*, the First Circuit has not clarified whether objective medical evidence (in addition to a claimant's testimony) regarding side effects is necessary to

---

[38] Unlike *Figueroa,* the First Circuit did not address the issue in-depth in *De Jesus;* nor did it reference its prior decision in *Figueroa. See De Jesus*, 1992 WL 137507, at *3; *cf. Figueroa*, 585 F.2d at 553–54.

trigger an ALJ's duty to consider the side effects of medication testified to by a claimant.

District courts have split on the issue.  *See Christopher B. v. Kijakazi*, No. 22-cv-00333-NT,

2023 WL 5949446, at \*2–5 (D. Me. Sept. 13, 2023), report and recommendation adopted, No.

22-cv-00333-NT, 2023 WL 6390661 (D. Me. Oct. 2, 2023) (citing *De Jesus* and holding that

ALJ did not error where the Plaintiff failed to identify any "medical evidence in the record

before the ALJ creating a colorable claim that his medications caused the side effects of which

he complained"); *but see Garay v. Colvin,* No. 14-cv-30138-MGM, 2015 WL 1648748, at \*4 (D.

Mass. Apr. 14, 2015) (citing *Figueroa* and reversing and remanding where, "in his testimony,

Plaintiff sufficiently raised th[e] issue of the detrimental effects of his medication. . .  potentially

affect[ing] his ability to work," but "the ALJ did not adequately consider, explore, or discuss in

his decision the potentially limiting effect of the side effects of Plaintiff's prescribed

medications"); *Rosa v. Sec'y of Health & Hum. Servs*., 547 F. Supp. 712, 717–18 (D. Mass.

1982) (citing *Figueroa* and holding that where claimant testified to side effects including

drowsiness caused by his pain medication, ALJ erred where there was "no inquiry or

investigation into . . .  the side effects caused by ingestion of [the medication]," and that "[a]t a

minimum, [the ALJ] should have made a finding concerning the side effects of taking the drug as

opposed to ignoring it").

      Here, though, the Court need not decide whether additional objective medical evidence

was required to trigger the ALJ's duty to inquire and address the side effects of the Gabapentin

in this case because it finds that there is already such evidence in the record.  In addition to

Plaintiff's testimony regarding the side effects, Plaintiff's treating neurologist, Dr. Bashir, and

consulting psychologist, Dr. Hoekstra, both noted the existence of the side effects, at least at the

higher dose.  *See* Tr. 618–19 (Dr. Bashir notes that Gabapentin was causing side effects,

including "sedation" or making Plaintiff "very tired," and decreases Plaintiff's dosage); *id.* at 615 (noting that Plaintiff was "struggling to regulate his sleep" while on Gabapentin, and that he "reported sleeping [twelve] hours a day").  Additionally, the side effects to which Plaintiff testified are the very side effects that his PCP, Dr. Durha, warned him about in December 2021 prior to his starting Gabapentin.  *See id.* at 559 (Dr. Durha's December 17, 2021 visit notes prescribing 300 mg Gabapentin and advising Plaintiff that he should try Gabapentin at night because it could result in drowsiness).[39]

Furthermore, the Court notes that the Commissioner is mistaken in his timeline regarding Plaintiff's Gabapentin dosage, and, in particular, in the assertion that Plaintiff did not complain of any side effects associated with Gabapentin until he was taking 900 mg.  [ECF No. 16 at 13-14].  Just prior to the time Plaintiff testified at his first hearing on September 26, 2022, regarding the Gabapentin side effects, his neurologist, Dr. Bashir, increased his dosage from 300 mg to 600

---

[39] Other district courts addressing the same issue have specifically held that ALJs erred in failing to account for Gabapentin's side effects based on "'pharmaceutical literature' document[ing] that Gabapentin may cause side effects including 'drowsiness, tiredness, weakness, dizziness, and memory problems.'" *Nieves v. Comm'r of Soc. Sec.*, No. 20-cv-08873 (SLC), 2022 WL 951107, at *11 (S.D.N.Y. Mar. 30, 2022) (quoting *Caternolo v. Astrue*, No. 11-cv-06601 (MAT), 2013 WL 1819264, at *11 (W.D.N.Y. Apr. 29, 2013) (remanding where there was no indication that ALJ considered the extensive side effects of claimant's Gabapentin)).  Specifically, in *Nieves*, the district court held that where the plaintiff testified that Gabapentin "caused drowsiness and affected his ability to concentrate, such that even when he worked in an office setting, he "wasn't able to perform [his] duty because of the concentration level," the ALJ's simple acknowledgement that Plaintiff "reported some side effects to medication" was insufficient and remand was required to address the impact of the side effects testified to by the plaintiff.  2022 WL 951107, at *11.

mg.[40]  Tr. 73–74, 78–79, 580.  Accordingly, Plaintiff was taking, at most, [41] 600 mg of

Gabapentin when he testified at the September 2022 hearing that the side effects of the

medication would make it difficult for him to work.[42]  *Id.* at 74.

Review of the ALJ's entire decision confirms that the ALJ never addressed Plaintiff's

testimony regarding the side effects of his medication.  *See* Tr. 14–23.  The Court also rejects the

Commissioner's suggestion that the ALJ's general discounting of Plaintiff's testimony may be

interpreted to imply that the ALJ reached and addressed the issue regarding the medication's side

effects.

Accordingly, on remand, the ALJ is ordered to specifically consider the impact of any

medication side effects on Plaintiff's RFC, and, in doing so, to develop the record, as

appropriate, to enable the ALJ to meaningfully consider the issue.  *See Plourde v. Barnhart*, No.

02-cv-00164-B-W, 2003 WL 22466176, at *5 (D. Me. Oct. 31, 2003), report and

recommendation adopted, No. 02-cv-00164-B-W, 2003 WL 22722078 (D. Me. Nov. 18, 2003)

(holding that where a physician note in record stated that Plaintiff complained of fatigue, the note

"flagged the side-effects issue sufficiently to put it into play" such that the ALJ erred in failing to

consider the issue, and should on remand "take additional testimony from a medical advisor on

---

[40] Dr. Bashir noted on September 12, 2022, that Plaintiff remained on 300 mg of Gabapentin, and
that he advised Dr. Bashir that he did not "like taking medication."  Tr. 579.  Dr. Bashir
increased Plaintiff's dosage on September 12, 2022, to 600 mg, advising Plaintiff to "monitor for
side effects."  *Id.* at 580.

[41] When Dr. Bashir increased Plaintiff's Gabapentin dosage on September 12, 2022, from 300
mg to 600 mg, Dr. Bashir noted that the increase would require a "slow titration . . . *over several
weeks* to 600 [mg]."  Tr. 580 (emphasis added).

[42] To the extent the Commissioner argues that the medication side effects lasted an insufficient
amount of time, that is an issue to be developed and established on remand given that it was not
addressed by the ALJ in either of the ALJ's decisions.

the question of the plaintiff's RFC (including whether she suffers any side effects of medication), to make a fresh RFC determination and to factor that new RFC into any hypothetical questions posed to a vocational expert"); *see also Pierce v. Colvin,* 245 F. Supp. 3d 254, 266–68 (D. Mass. 2017) (reversing and remanding for medical evaluation of "the effects of [Plaintiff's] pain medications" where Plaintiff complained that her medications caused her drowsiness and her physician noted she was "sluggish" but ALJ failed to adequately consider the side effects).

### G.    Remand is Required for Further Development of the Record and Additional Proceedings.

Plaintiff asks the Court to grant his motion and "issue an order finding [him] disabled or remanding this matter and granting such other and further relief [that the] Court deems just and proper." [ECF No. 11 at 16]. The Commissioner has not addressed Plaintiff's requested relief. *See* [ECF No. 16].

"Under the Social Security Act, courts are empowered 'to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Sacilowski*, 959 F.3d at 437 (citing 42 U.S.C. § 405(g); *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014); and *Seavey*, 276 F.3d at 8–9). "[E]very Court of Appeals has recognized that in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits." *Sacilowski,* 959 F.3d at 437 (quoting *Garrison,* 759 F.3d at 1019). "Courts have generally exercised this power when it is clear from the record that a claimant is entitled to benefits." *Id.*; *see also Seavey*, 276 F.3d at 11–12.

An award of benefits is inappropriate in this case because further development of the record and proceedings are required, as described below. *See Manso-Pizarro*, 76 F.3d at 19

(finding ALJ erred by determining claimant's RFC without support of an expert's evaluation and remanding case for development of record regarding "evidence of functional ability").

Specifically, for the reasons above, on remand, the ALJ is required to:

(1)    Obtain medical opinion evidence regarding the functional limitations associated with Plaintiff's physical impairments and pain, and reevaluate those impairments and their limitations in assessing Plaintiff's RFC at step four.

(2)    Develop the record further regarding the side effects associated with Plaintiff's medication and his pain and their impact on his need to be off-task or absent from work, and reconsider his RFC in light of those limitations.

(3)    Obtain additional medical opinion evidence regarding the severity of and functional limitations associated with Plaintiff's mental impairments, and reconsider the step two Paragraph B findings and, regardless of the ALJ's Paragraph B severity determination, consider the impact of Plaintiff's mental impairments on his RFC at step four.

a.    If on remand the ALJ determines that Plaintiff's mental impairments are severe, the ALJ must additionally consider and compare at step three Plaintiff's mental impairments in light of the relevant Listings.

(4)    Consider whether Plaintiff's cognitive impairments (learning disorder/ADHD) constitute an MDI, and, in doing so, develop the record as warranted.  If either constitutes an MDI, the ALJ must consider its severity at step two and its impact on Plaintiff's RFC at step four.

(5)    Reevaluate Plaintiff's testimony regarding his physical impairments at step four, accounting specifically for all of the evidence regarding the effects of Plaintiff's treatment on his limitations and the side effects associated with Gabapentin.

71

(6)    Evaluate in the first instance Plaintiff's testimony regarding the effect of his

mental impairments and limitations on his RFC.

(7)    Reassess Plaintiff's RFC at step four; reformulate the VE hypothetical at step

five; and reconsider the step five findings in light of the reformulated RFC

and VE hypothetical.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiff's motion to reverse the decision of the

Commissioner, [ECF No. 10], is **<u>GRANTED</u>**.  The Commissioner's motion to affirm, [ECF No.

15], is **<u>DENIED</u>**.  Pursuant to sentence four of section 405(g), the case is remanded to the

Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**

May 14, 2025                                                    */s/ Allison D. Burroughs*
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE